

# In the Missouri Court of Appeals
# Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102585 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | 13SL-CR04581-01 |
| | ) | |
| DAVID E. SMITH | ) | Honorable Tom W. DePriest, Jr. |
| | ) | |
| Appellant. | ) | Filed:  April 5, 2016 |

David E. Smith ("Defendant") appeals the judgment entered upon a jury verdict

convicting him of one count of first-degree assault, one count of first-degree robbery, and two

counts of armed criminal action.  On appeal, Defendant argues the trial court erred in denying his

motion for a mistrial and, in the alternative, his motion to continue the trial, after it was

discovered during the trial that Bridgeton police had video surveillance footage from the scene of

the crimes which was not disclosed to the defense prior to trial.  Defendant also claims the trial

court erred in denying his motions to dismiss his charges on the grounds his right to a speedy

trial had been violated.  We affirm.

### I.    BACKGROUND

On July 1, 2013, Defendant was charged with the above crimes for his alleged

involvement in an incident involving Florentino Marquez Tellez ("Victim").  Defendant was

tried by a jury on November 3-7, 2014, and he does not challenge the sufficiency of the evidence to support his convictions.

## A.      Evidence Presented at Defendant's Jury Trial

Viewed in the light most favorable to the verdict, the evidence presented at Defendant's jury trial revealed the following.

On May 10, 2013, Defendant, Shenee Edwards, Lindsay Dames, Kevin Nolfo, and Jake Dwyer were gathered in Room 235 of the Northwest Airport Inn in Bridgeton ("the motel"). After Defendant smoked crack cocaine, he asked Dames if she knew of someone he could rob, and Dames suggested Victim. Dames and Victim were acquaintances, and Dames thought Victim would have substantial cash from getting paid at work that day. In addition, Dames and Victim had already planned to meet up at a nearby Domino's Pizza later that night. Defendant asked Dames if Victim would fight back, and Dames said she did not think he would.

Nolfo and Dwyer were asked if they wanted "in" on the robbery, but they declined. Dames and Edwards then left the motel room to meet Victim. Victim, who lived close by, walked from his home to the Domino's, where he met Dames and Edwards. They ordered food and Victim paid for it. Subsequently, Dames asked Victim to accompany her and Edwards back to the motel, and Victim agreed.

Dames contacted Dwyer and told him that he and Nolfo needed to get out of the motel room since they did not want to participate in the robbery. Dwyer then sent Dames a text message telling her Defendant would be hiding in the bathroom.

Thereafter, Dames, Edwards, and Victim arrived at the motel room, and Dames and Edwards left Victim alone on the couch in the living room.[1] Defendant subsequently left the bathroom and charged toward Victim, while holding a knife in his hand and yelling curse words.

---

[1] The motel room was divided into living room, bedroom, kitchen, and bathroom.

Defendant then hit Victim in the face with his elbow and stabbed Victim near his heart. Victim, who was bleeding heavily, dropped his cell phone and tried to grab it, but Defendant kicked it away. Defendant then said to Victim, "[G]ive me the money, mother [expletive]," while continuing to hold the knife. Victim removed about $130 in cash from his pocket and threw it on the carpet. Defendant then took Victim's money and cell phone and ran out of the room. Dames followed Defendant, and they both drove away in Defendant's black Chevrolet truck.

As they were driving away from the motel, Dames asked Defendant, "What the [expletive]?" referring to the fact that hurting Victim had not been part of the plan. Defendant, who was still holding a knife, told Dames to shut up or he would slit her throat. Defendant then threw the knife out of the passenger window of the truck as he was driving through St. Ann. He later parked in a residential area of Breckenridge Hills and told Dames to walk down the street with him. Defendant kicked Victim's cell phone into a sewer, and he and Dames went to a nearby house, where Defendant knocked on the door and asked the occupant if he could have something to clean himself up with in exchange for cash. After the occupant brought Defendant a towel, Dames sent a text to message to Edwards, asking to be picked up. Edwards, Nolfo, and Dwyer arrived in Dwyer's vehicle, and Dames got in. Defendant, who had shoulder-length hair at the time, told Dames, Edwards, Nolfo, and Dwyer to tell the police the man who stabbed and robbed Victim was "a long-haired biker," with hair that went down to the middle of his back. Defendant got his hair shaved off the day after the incident.

After Victim was stabbed and robbed, he walked back to the Domino's, where he passed out, and he later underwent surgery. Victim suffered a knife wound to the chest which lacerated the right ventricle of his heart, penetrated his diaphragm, and lacerated his liver. Victim had internal bleeding, and he would have bled to death without medical attention.

3

Dames was questioned by police about a week after the incident. The police showed Dames multiple still-image photographs taken from one of the motel's video surveillance cameras ("camera eleven"), and she identified herself, Defendant, Edwards, Nolfo, and Dwyer as the individuals shown in the photographs. Dames also later identified Defendant from a photograph array of a total of six men who resembled one another. Dames told the police Defendant had physically assaulted Victim after she brought him to the motel to be robbed, and she also told police where Defendant had disposed of Victim's cell phone.[2] Detectives went to that location and recovered the cell phone, in pieces, from the sewer. Prior to and during trial, Victim identified the cell phone as the phone that was taken from him in the motel room.

Victim was shown a still-image photograph taken from camera eleven, and he testified at trial that the man in the photograph looked like the man who stabbed and robbed him. When shown the same still-image photograph at trial, Nolfo, Dwyer, and Defendant's wife identified Defendant as the man in the photograph.

Before trial, Victim viewed a line-up of men including Defendant, and prior to and during trial, Victim identified Defendant as the man in the line-up who stabbed and robbed him. Victim also stated Defendant's hair was longer at the time of the incident than it was at the time of the line-up.

### B.  Relevant Procedural Posture

#### 1.  Defendant's Motions to Dismiss, Motion for a Mistrial, and Motion to Continue the Trial

Prior to trial, Defendant's counsel filed motions to dismiss Defendant's charges on the grounds his constitutional and statutory right to a speedy trial had been violated, which the trial

---

[2] Dames did not tell police about Defendant throwing the knife out of his truck, so they never searched for it and never recovered it. A knife was seized from Defendant's truck after he was arrested, but it was not connected to the stabbing.

4

court denied. During the trial, Defendant filed a motion for a mistrial and, in the alternative, a motion to continue the trial, after it was discovered during the trial that the Bridgeton police had video surveillance footage from the motel which was not disclosed to the defense prior to trial. The trial court denied both of those motions.[3]

### 2. The Jury's Verdict, Defendant's Motion for a New Trial, and the Trial Court's Judgment

After hearing all of the evidence, including that which is set out above in Section I.A., the jury found Defendant guilty of one count of first-degree assault (Count I), one count of first-degree robbery (Count III), and two counts of armed criminal action (Counts II and IV). Defendant filed a motion for a new trial, asserting the trial court erred in denying his motions to dismiss, motion for a mistrial, and his motion to continue the trial. The trial court denied Defendant's motion for a new trial.

Thereafter, the trial court entered a judgment in accordance with the jury's verdict. The court sentenced Defendant as a prior and persistent offender to consecutive terms of life imprisonment for Counts I and II and to concurrent terms of life imprisonment for Counts III and IV, with the sentences for Counts I and II to run concurrently with the sentences for Counts III and IV. Defendant appeals.

## II. DISCUSSION

Defendant raises three points on appeal. In his first and second points on appeal, Defendant asserts the trial court erred in denying his motion for a mistrial and, in the alternative, his motion to continue the trial. In his third point on appeal, Defendant contends the trial court erred in denying his motions to dismiss his charges on the grounds his right to a speedy trial had been violated.

---

[3] Further details regarding Defendant's motions to dismiss, motion for a mistrial, and motion to continue the trial will be discussed below in Sections II.A. and II.B.

**A.** **The Trial Court's Denials of Defendant's Motion for a Mistrial and His Motion for a Continuance**

Defendant's first and second points on appeal assert the trial court erred in denying his motion for a mistrial and, in the alternative, his motion to continue the trial, after it was discovered during the trial that Bridgeton police had video surveillance footage from the motel which was not disclosed to the defense prior to trial. Because both of these points involve the same underlying facts, standard of review, and general law, we will address them together.

**1.** **Relevant Facts**

On July 10, 2013, defense counsel filed a request for discovery pursuant to Rule 25.03(A)[4] requesting, *inter alia*, "[a]ny material or information within the possession or control of the State or its agents which tends to negate the guilt of the defendant as charged, or reduce punishment." *See* Rule 25.03(A)(9). Prior to trial, the State disclosed to the defense video surveillance footage from camera eleven at the motel, and this was the only surveillance footage which was given to the defense prior to trial.

Testimony at trial revealed the police showed Dames multiple still-image photographs taken from camera eleven, and she identified herself, Defendant, Edwards, Nolfo, and Dwyer as the individuals shown in the photographs. In addition, Victim was shown a still-image photograph taken from camera eleven, and he testified at trial that the man in the photograph looked like the man who stabbed and robbed him. When shown the same still-image photograph at trial, Nolfo, Dwyer, and Defendant's wife identified Defendant as the man in the photograph.

On Tuesday, November 4, 2014, the first day of trial testimony, the State called Bridgeton Police Detective Brice Loveall as a witness, and he testified to the following. Detective Loveall went to the motel on the night of the crimes against Victim and met another

---

[4] All references to Rules are to Missouri Supreme Court Rules (2015).

6

officer who was reviewing the motel's video surveillance tapes. After the other officer pointed out that video surveillance footage from camera eleven showed Victim and others on the motel stairwell, Detective Loveall had the motel staff download the footage from camera eleven onto a flash drive. Detective Loveall identified State's Exhibit 26 as a copy of the footage that had been forwarded to the prosecutor's office, and the exhibit was admitted without objection.

During defense counsel's cross-examination of Detective Loveall, counsel sought confirmation from the detective that footage from the surveillance camera in the motel lobby was not seized. The detective testified that copies of surveillance footage from "all video cameras" were seized and were on a DVD which was given to the prosecutor's office. Defense counsel then requested a bench conference and informed the court that Detective Loveall's testimony was unexpected because the only video surveillance footage counsel had received was from camera eleven. The prosecutor stated she also had not received any footage from any other cameras, and she later told the court every piece of evidence she had was turned over to defense counsel and that she learned of the additional surveillance videos at the same time as defense counsel. Upon further questioning by defense counsel, Detective Loveall testified he was not the person who provided any copies of video surveillance footage to the prosecutor, so he did not actually know if footage from cameras other than camera eleven were turned over. The detective also testified that all of the video surveillance footage was on file with the other evidence in the case on the law enforcement server.

The trial court subsequently ordered defense counsel to be provided with the DVD containing the undisclosed surveillance footage before 5:00 p.m. that day. The court asked defense counsel if an overnight review of the footage would be sufficient, and counsel stated it

7

would be so long as Detective Loveall would be available for recall. The court stated the detective would be available for recall.

When court reconvened the following morning (Wednesday, November 5, 2014), the court made a record that the DVD with the previously-undisclosed surveillance footage had been turned over to defense counsel. Defense counsel informed the court that a large portion of the footage had been reviewed the previous night, and investigators and interns at the Public Defender's office would continue to view the footage while counsel participated in the trial. Defense counsel also told the court that all of the footage would be viewed by the end of the day and the State's case was expected to continue for the next one to two days.

When court reconvened the next morning (Thursday, November 6, 2014), defense counsel made a record that the motel had three video banks of cameras, with each bank containing up to sixteen different cameras. Counsel also stated that camera number nine ("camera nine") and camera number ten ("camera ten") looked out from the lobby towards the parking lot, and footage from those cameras showed a black Chevrolet truck which appeared to match Defendant's leaving the parking lot and entering the adjacent street at 10:09:39 p.m.

Counsel then noted the video footage from camera eleven showed Victim entering the motel at 10:09:54 p.m. and a man identified by witnesses as Defendant leaving the motel at 10:16:06 p.m. Defense counsel argued that the time stamps on the cameras thus showed Defendant's truck leaving the motel parking lot before Victim had even arrived at the motel.

Counsel then told the court he had received an email from the prosecutor at 6:45 p.m. on the previous evening (Wednesday) indicating another Bridgeton police detective, William Dickherber, had gone to the motel earlier that day and taken "screen shots" of two video banks – one containing cameras nine and ten and a different one containing camera eleven. The email

8

further indicated Detective Dickherber had discovered a time discrepancy between the two video banks of six minutes and twenty-three seconds.

At this point, defense counsel moved for a mistrial, arguing the video surveillance footage from cameras nine and ten should have been disclosed to the defense during the normal discovery process and that the State's failure to disclose the evidence constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The court questioned the impact of the "time" issue on Defendant's case and noted that if Defendant's defense was misidentification, then presenting evidence of his truck leaving the motel parking lot would be damaging evidence indicating he was at the scene of the charged crimes. In response, defense counsel argued Defendant made a statement to the police that he loaned his truck to someone on the night of the incident, so the presence of the truck did not damage his defense that he did not commit the crime. The court noted Defendant's statement to the police had been previously suppressed[5] and denied the motion for a mistrial.

Defense counsel subsequently moved for a continuance of the trial so he could investigate whether time discrepancies in the videos existed on the day of the charged crimes. The trial court denied the motion.

Subsequently, Detective Dickherber testified for the State and described information obtained during his review of the video cameras at the motel on Wednesday, November 5. Detective Dickherber testified that the motel had four different servers for its surveillance camera system, and camera eleven was on a different server than cameras nine and ten. The detective also testified he compared the time stamp on the servers to the time reflected on his own watch. Detective Dickherber stated that while the time stamp on the server for camera

---

[5] Prior to trial, defense counsel filed a motion to suppress Defendant's statement to the police on the grounds it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and the trial court granted the motion.

eleven matched his watch and appeared to be accurate, the time stamp on the server for cameras nine and ten was six minutes and twenty-three seconds slower than the time stamp on the server for camera eleven.

During defense counsel's cross-examination of Detective Dickherber, defense counsel played a portion of the video surveillance footage captured by cameras nine and ten and entered into evidence still photographs taken from the footage. Counsel elicited testimony from Detective Dickherber that the time stamp on cameras nine and ten showed a truck appearing to match Defendant's leaving the motel parking lot at 10:09:39 p.m., while camera eleven showed the Victim entering the motel at 10:09:54 p.m. Counsel also elicited testimony from the detective that even factoring in the alleged six minute and twenty-three second discrepancy, the time stamp on cameras nine and ten showed the truck leaving the motel parking lot at 10:16:02 p.m., while the time stamp on camera eleven showed the man identified as Defendant present in the motel stairwell at 10:16:06 p.m. Detective Dickherber conceded that, by his own investigation into the cameras and even compensating for the alleged time discrepancy, the truck appearing to match Defendant's was leaving the motel parking lot while the man identified as Defendant was still in the motel stairwell.

During closing argument, defense counsel argued about the video evidence and Detective Dickherber's testimony to the jury:

> If you add up the times, even giving [Detective Dickherber] the benefit of the doubt that these camera banks are not in sync[,] . . . if you add the time discrepancy, which is 6:23, you get [10:]16:02, and you can take your time to work the math. That truck is in motion [while the suspect] is walking out, and [the detective] knows he has a problem . . . and evidence is not coming together the way he wants it.
>
> . . .

10

I know yesterday I was cross with Detective Dickherber, but these are very serious matters, and . . . in this case . . . we're not talking about reasonable doubt. [Defendant] was not there in that room when [Victim] was stabbed and robbed.

## 2.      Standard of Review and General Law

In this case, Defendant argues the trial court erred in denying his motion for a mistrial, and, in the alternative, his motion to continue the trial because the State violated Rule 25.03 and *Brady* by failing to disclose all of the video surveillance footage from the motel prior to the trial.

Whether a particular sanction should be imposed for noncompliance with Rule 25.03 and/or disclosure of exculpatory evidence as required by *Brady* is a matter that lies within the sound discretion of the trial court. *State v. Wallace*, 43 S.W.3d 398, 402 (Mo. App. E.D. 2001). The trial court may order disclosure of the evidence, grant a mistrial, grant a continuance, exclude such evidence, or enter such other orders it deems just under the circumstances of the case. *Id.*; Rule 25.18.

A mistrial is a drastic remedy which should be reserved for situations where all other remedies are inadequate, and an appellate court will reverse a trial court's denial of a motion for a mistrial only when there has been an abuse of discretion. *State v. Blevins*, 385 S.W.3d 526, 528 (Mo. App. S.D. 2012); *Wallace*, 43 S.W.3d at 403. Similarly, "[a] trial court's decision denying a motion for a continuance will be reversed only if there is a strong showing that the trial court abused its discretion and that prejudice resulted from the denial of the motion." *State v. Litherland*, 477 S.W.3d 156, 163 (Mo. App. E.D. 2015). An abuse of discretion occurs when the trial court's ruling was "so illogical, arbitrary, and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Blevins*, 385 S.W.3d at 528 (quotations omitted). Moreover, whether a trial court committed reversible error in denying a motion for a mistrial or a motion for a continuance is determined by considering the circumstances of each

11

case. *Litherland*, 477 S.W.3d at 163; *City of Sugar Creek v. Harmon*, 607 S.W.2d 777, 781 (Mo. App. W.D. 1980).

Rule 25.03(A)(9) requires the State to provide to the defendant, upon written request, "[a]ny material or information, within the possession or control of the [S]tate, which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment." The purpose of Rule 25.03(A) "is to grant the defendant a decent opportunity to prepare his case in advance of trial and avoid surprise." *State v. Ivy*, 455 S.W.3d 13, 18 (Mo. App. E.D. 2014) (quotations omitted). The State's duty to disclose evidence to the defense includes information that is actually known to the prosecutor prior to trial as well as information that he or she may have learned of through reasonable inquiry. *State v. Mabry*, 285 S.W.3d 780, 787 (Mo. App. E.D. 2009). Although compliance with the Rule is mandatory, appellate courts will find a trial court abused its discretion in failing to impose a remedy for a discovery violation only where the defendant demonstrates the State's failure to make a timely disclosure resulted in fundamental unfairness. *Ivy*, 455 S.W.3d at 18; *Mabry*, 285 S.W.3d at 787. "Fundamental unfairness turns on whether there was a reasonable likelihood that an earlier disclosure of the requested evidence would have affected the result of the trial." *Ivy*, 455 S.W.3d at 18 (quotations omitted).

Pursuant to *Brady*, due process is violated where the State fails to disclose evidence in its possession which is favorable to the accused and is material with respect to either guilt or punishment. *Barton v. State*, 432 S.W.3d 741, 761 (Mo. banc 2014); *State v. Reed*, 334 S.W.3d 619, 625 (Mo. App. E.D. 2011). "The prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in [a] case, including the police," because it is the prosecutor's duty to learn of such evidence. *State v. Parker*, 198 S.W.3d 178, 184 n. 2

12

(Mo. App. W.D. 2006) (quoting *Strickler v. Greene,* 527 U.S. 263, 275 n. 12 (1999)) (internal quotations omitted). In order to make a successful *Brady* claim, the defendant has the burden to show, (1) the evidence at issue is favorable to the defendant, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant was prejudiced as a result of the suppression of the evidence, i.e., that the evidence is material. *Barton*, 432 S.W.3d at 761; *see Reed*, 334 S.W.3d at 626 (holding that the defendant has the burden to prove elements of a *Brady* claim). Evidence is considered material if:

> there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. The materiality inquiry is not simply a matter of whether, after discounting the inculpatory evidence, there remains sufficient evidence to support the conviction. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Barton*, 432 S.W.3d at 761 (quoting *Strickler*, 527 U.S. at 280, 289-90) (internal citations and quotations omitted). Evidence is also considered material "if it would have provided the defendant with plausible and persuasive evidence to support a theory of innocence or would have enabled the defendant to present a plausible, different theory of innocence." *State v. McKay*, 411 S.W.3d 295, 305 (Mo. App. E.D. 2013).

### 3. Analysis and Defendant's Arguments

The State does not dispute the following: (1) Defendant made a timely written request for discovery pursuant to Rule 25.03(A)(9); (2) the video surveillance footage from all of the cameras at the motel should have been disclosed to the defense prior to trial; (3) the footage in cameras nine and ten contained evidence favorable to Defendant; and (4) the evidence was

13

inadvertently suppressed by the State. Instead, the State maintains Defendant is not entitled to relief on appeal because he cannot show the State's failure to make a timely disclosure of the evidence resulted in fundamental unfairness or was material pursuant to *Brady*; accordingly, our analysis will be confined to a determination of these issues. We will specifically examine Defendant's contentions that, (a) his case is similar to the Western District's Decision in *Buchli v. State*, 242 S.W.3d 449 (Mo. App. W.D. 2007); (b) the late-disclosure of the evidence affected his trial strategy; and (c) the trial court's denial of his motion for a continuance affected his ability to prepare a defense to the late-disclosed video surveillance footage.

### a. *Buchli v. State*

*Buchli* is the main case relied upon by Defendant.[6] In *Buchli*, a jury found defendant guilty of first-degree murder and armed criminal action. *Id*. at 451. Defendant subsequently filed a Rule 29.15 motion for post-conviction relief alleging the State violated *Brady* by failing to disclose all portions of Exhibit 134, a building surveillance video tape made on the day of the murder between 6:49 a.m. and 5:39:50 p.m. *Id*. at 451-52. The State had turned over a portion of the recording from 1:13 to 2:39 p.m., which encapsulated the timeframe when the victim died and defendant left the scene. *Id*. At trial, the State used the video tape's time stamp to try and expand the window of opportunity defendant had to commit the crime and to leave the scene. *Id*. at 452. The State called a detective who testified that twelve days after the crimes were committed, the time stamp on the recording device was three minutes behind the time indicated on his pager, and the State used other evidence to argue the time stamp was slow and was as much as five minutes behind real time. *Id*. at 452, 454-55. In addition, the State presented

---

[6] Defendant also relies on *Ferguson v. Dormire*, 413 S.W.3d 40 (Mo. App. W.D. 2013) and *Duley v. State*, 304 S.W.3d 158 (Mo. App. W.D. 2009) for general propositions of law relating to the late-disclosure of evidence, relevant portions of which are discussed above in Section II.A.2. *Ferguson* and *Duley* are distinguishable from the circumstances of this case because, *inter alia*, they involved untimely disclosure of witness statements rather than video evidence. *Ferguson*, 413 S.W.3d at 44, 53-72; *Duley*, 304 S.W.3d at 161, 162-65.

testimony from a witness, a building engineer who was not involved in the events surrounding the crimes, regarding the time he saw the defendant exit the building where the crimes occurred. *Id*. at 452, 453.

In granting defendant post-conviction relief on his *Brady* claim, the motion court found Exhibit 134 was exculpatory and material under *Brady*, because it demonstrated that when the detective retrieved the surveillance tape on the day of the murder at 5:40 p.m., the time stamp on the tape indicted 5:39:50 p.m. *Id*. at 451-52. The motion court concluded Exhibit 134 would have established the time stamp on the video was accurate and would have cast doubt on the State's alternative timeline theory. *Id*. at 452. The State appealed, and the Western District affirmed the motion court's grant of post-conviction relief. *Id*. at 452, 456. The Court held Exhibit 134 "would have provided [defendant] with plausible and persuasive evidence to support his theory of innocence by supporting his theory that he did not have enough time to commit the crime" and found the exhibit put the case in such a different light that it undermined confidence in the verdict. *Id*. at 455.

In *Buchli* and this case, the State failed to disclose all video surveillance evidence prior to trial and the State presented evidence at trial indicating there was a discrepancy in the time stamps on surveillance footage. *See id*. at 451, 452, 454-55. But that is where the similarities end. Here, in attempting to explain to the jury the motel's video surveillance system and the various cameras and footage, the State presented testimony from Detective Dickherber that he observed a discrepancy in the time stamps on cameras nine and ten as compared to camera eleven. Defense counsel was then able to cross-examine Detective Dickherber and gain an admission that even when the alleged discrepancy was figured in, the cameras still showed the truck which appeared to match Defendant's leaving the motel parking lot while the man

15

identified as Defendant was still in the motel stairwell. Defendant was also able to put before the jury the fact that the time stamps on cameras nine and ten, had they been accurate, showed the truck leaving the parking lot before the Victim entered the motel, as reflected by the time stamp on camera eleven. This is in contrast to the circumstances in *Buchli*, where the defendant did not have an opportunity to utilize the potentially exculpatory evidence in front of the jury. *See id.* at 451-56.

The facts of this case are further distinguishable from *Buchli* because here, after the existence of undisclosed surveillance footage became apparent to both defense counsel and the prosecutor during the Tuesday of trial, the trial court ordered the police to provide defense counsel with the footage before the end of the day. Defense counsel received the footage, and staff from defense counsel's office reviewed all of the footage before the end of the presentation of the State's case. In addition, after counsel utilized the footage during his cross-examination of Detective Dickherber and elicited the favorable testimony discussed above, counsel highlighted Detective Dickherber's testimony during closing argument. Specifically, defense counsel argued to the jury that even if they gave the detective the benefit of the doubt and believed his testimony that the cameras were not in sync and contained a time discrepancy, the discrepancy showed the truck which appeared to be Defendant's leaving the motel parking lot while the suspect was still in the motel stairwell. Defense counsel further argued during closing that Detective Dickherber's testimony was problematic for the State and demonstrated Defendant was not in the motel room when Victim was stabbed and robbed. None of the preceding circumstances took place in *Buchli*.

*Buchli* is further distinguishable because in this case, the State presented testimony from four witnesses who were involved in the events surrounding the charged crimes. *See id.* at 452,

16

453 (the State presented testimony from a building engineer who was not involved in the events surrounding the crimes regarding the time he saw the defendant exit the building where the crimes occurred). Here, Dames, Nolfo, Dwyer, and Victim provided overwhelming testimony, independent of any testimony identifying Defendant as the man in the surveillance footage from camera eleven, which placed Defendant in the motel room near or at the time the crimes against Victim occurred and implicated Defendant as the person who stabbed and robbed Victim.

Based on the foregoing, we cannot find that had the video surveillance footage from cameras nine and ten been disclosed earlier, it would have provided Defendant with a plausible and persuasive theory of innocence or would have put the case in such a different light that it undermined confidence in the verdict. *Cf.* at 455. In other words, Defendant has not demonstrated that the late-disclosed surveillance footage was material under *Brady*. *See Barton*, 432 S.W.3d at 761; *McKay*, 411 S.W.3d at 305. Similarly, Defendant has not demonstrated the State's failure to make a timely disclosure of video surveillance footage from cameras nine and ten resulted in fundamental unfairness, i.e., that there was a reasonable likelihood an earlier disclosure of the evidence would have affected the result of the trial. *Ivy*, 455 S.W.3d at 18.

### b. Whether the Late-Disclosure of Evidence Affected Defendant's Trial Strategy

Defendant also argues the late disclosure of video surveillance footage from cameras nine and ten resulted in fundamental unfairness and was material under *Brady* because it affected his trial strategy. Defendant maintains that had he known about the evidence before trial, defense counsel would not have filed a motion to suppress Defendant's statement to the police that he loaned his truck to someone on the night of the incident and counsel would have interviewed the person who allegedly borrowed Defendant's truck. We agree with the State's contention that

17

"the decision to suppress [Defendant's] statement had nothing to do with the ability to present independent evidence that [Defendant] loaned out his truck."

Further, the late-disclosed footage from cameras nine and ten, combined with the footage from camera eleven, showed a truck appearing to be Defendant's leaving the parking lot of the motel while the suspect was still in the motel stairwell. We cannot understand how knowledge of this information before trial would have somehow enabled Defendant to present a plausible, different theory of innocence based upon the alleged assertion that Defendant loaned out his truck on the night of the charged crimes. *See McKay*, 411 S.W.3d at 305 (evidence is considered material under *Brady* when, *inter alia*, it would have enabled the defendant to present a plausible, different theory of innocence). In other words, Defendant has not convinced this Court there is a connection between the late-disclosed video surveillance evidence and a theory that Defendant loaned out his truck on the night of the charged crimes.

Defendant has also not demonstrated that surprise from the late-disclosed video surveillance footage prevented meaningful efforts to consider and prepare a strategy for addressing the evidence where, (1) counsel's staff reviewed all of the evidence before the State's presentation of the evidence was complete; (2) counsel was able to utilize the evidence in cross-examining Detective Dickherber and gain admissions that were favorable to Defendant's case; and (3) counsel was able to highlight those admissions in closing argument. *See State v. Zetina-Torres*, 400 S.W.3d 343, 353-54 (Mo. App. W.D. 2013) (fundamental unfairness occurs when the State's failure to timely disclose evidence results in the defendant's "genuine surprise" and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the late-disclosed evidence). Therefore, Defendant has failed to demonstrate the late disclosure of

18

video surveillance footage from cameras nine and ten was material pursuant to *Brady* or resulted in fundamental unfairness because it affected his trial strategy.

### c. Whether the Trial Court's Denial of Defendant's Motion for Continuance Affected His Ability to Prepare a Defense

Finally, Defendant argues the trial court's denial of his motion for a continuance affected his ability to prepare a defense. Defendant specifically claims:

> [T]here was no way to know whether the surveillance cameras were synchronized on [the date of the crimes against Victim] without evaluation by a forensic expert. Given additional time for consultation with a computer forensic expert, [Defendant] could have prepared a defense that addressed the issues raised by the late-disclosed evidence.

Defendant does not cite to any controlling authority in support of this claim, and we find it is speculative. A trial court does not abuse its discretion in denying a motion for a continuance based on mere speculation. *State v. Johnson*, 812 S.W.2d 940, 944 (Mo. App. S.D. 1991).

More importantly, "[a] trial court's decision denying a motion for a continuance will be reversed only if there is a strong showing that the trial court abused its discretion and that prejudice resulted from the denial of the motion." *Litherland*, 477 S.W.3d at 163. Defendant has failed to make such a showing here. Defendant has also failed to demonstrate fundamental unfairness or prejudice under *Brady* resulted from his inability to consult with a computer forensic expert and the denial of his motion for a continuance where, *inter alia*, (1) defense counsel was able to elicit testimony from Detective Dickherber during cross-examination regarding the time stamps on the videos; and (2) defense counsel gained an admission from the detective that even when the alleged discrepancy was figured in, the cameras showed the truck appearing to match Defendant's leaving the motel parking lot while the man identified as Defendant was still in the motel stairwell.

## 4. Conclusion as to Points One and Two

Based on the foregoing, Defendant has not demonstrated the State's failure to make a timely disclosure of video surveillance evidence from cameras nine and ten resulted in fundamental unfairness or was material under *Brady*. Accordingly, we find the trial court did not abuse its discretion in denying Defendant's motion for a mistrial, or in the alternative, his motion for a continuance, under the circumstances of this case. Points one and two are denied.

## B. The Trial Court's Denial of Defendant's Motions to Dismiss His Charges on the Grounds His Right to a Speedy Trial Had Been Violated

In his third and final point on appeal, Defendant argues the trial court erred in denying his motions to dismiss his charges on the grounds his right to a speedy trial had been violated. For the reasons discussed below, we disagree.

## 1. Relevant Facts

In this case, a complaint was filed against Defendant on May 17, 2013, and an arrest warrant was served on him the same day. A grand jury indictment was filed on July 1, 2013, and a public defender ("defense counsel" or "counsel") entered his appearance for Defendant and filed a request for discovery on Defendant's behalf on July 10, 2013. Defendant's parole on another case was revoked, and he was delivered to the Missouri Department of Corrections on August 16, 2013. It is undisputed Defendant filed his first request for a speedy trial on October 25, 2013 and he continued to personally assert that request throughout the proceedings.[7]

Court dates were rescheduled from August 8, 2013 to November 1, 2013, but the record does not indicate who requested the rescheduling or why it was done. On November 22, 2013, Defendant's case was set for trial for March 31, 2014. Then, on March 7, 2014, defense counsel filed a motion for a continuance, alleging he needed more time to prepare for trial and the

---

[7] Some of Defendant's requests for a speedy trial and his motions to dismiss based on alleged violations of his constitutional and statutory right to a speedy trial are mentioned below.

continuance was being sought over Defendant's objection. At the hearing, counsel told the court he could not adequately represent Defendant if the case went to trial as scheduled because the discovery in the case was voluminous and additional investigation, including the taking of depositions, was necessary. The prosecutor responded that she agreed with defense counsel's statements but told the court the State was not requesting a continuance. The court found there was good cause to continue the trial, granted defense counsel's motion for a continuance, and reset the trial for September 15, 2014.

On September 8, 2014, the trial court held a hearing on various motions filed by defense counsel, including a motion to inspect and test evidence and a motion for sanctions. Defense counsel's motion to inspect and test evidence related to granting defense counsel access to a knife found in the vehicle of one of the witnesses so counsel could have it tested for DNA. The prosecutor told the court she had requested the police to have the knife tested at a crime lab, but she did not have the results. The court directed the crime lab to test the knife before the next scheduled hearing.

Defense counsel's motion for sanctions alleged, (1) defense counsel had been unable to locate Victim at the address given to him by the prosecutor; (2) the prosecutor provided various items to the defense on September 4 and 5, 2014, including recordings of phone conversations that Defendant had while in jail and a plea agreement between the State and Dames; and (3) Dames gave a recorded statement to law enforcement which had not been turned over to the defense. Defense counsel's motion requested all of the evidence listed in the motion be excluded from trial, or in the alternative, for the trial to be continued. The prosecutor responded to each of the allegations, noting she had provided defense counsel with Victim's last known address and had told defense counsel she would make Victim available for a deposition. In addition, the

21

prosecutor told the court the State did not intend to use the recordings of Defendant's phone conversations at trial, the State reached a plea agreement with Dames on September 4, Dames entered a guilty plea on the following day, and Dames' interview with the prosecutor's office was not recorded but a summary of the conversation was being prepared. Noting that defense counsel was in trial for the remainder of the week, the court ordered the State to make Victim available for a deposition to be conducted within the next ten days. Defense counsel indicated he wanted time to review the recordings and phone records turned over by the State to determine if they contained any exculpatory information. Defense counsel also stated he wanted to depose Dames, and the court ordered the deposition to be set up immediately. The court denied Defendant's motion for sanctions based on its knowledge of what had taken place, noting discovery in the case had been ongoing and voluminous. However, the court granted, over the State's objection and Defendant's personal objection, defense counsel's request for a continuance and rescheduled the trial for October 27, 2014.

On October 22 and 24, 2014, defense counsel filed numerous motions, including motions to suppress statements and physical evidence, a motion to dismiss all charges on the basis Defendant's right to a speedy trial had been violated, and a motion for a continuance. Counsel also filed Defendant's "personal motion" to dismiss based on alleged speedy trial violations. The court held a hearing on Defendant's motions on October 27, 2014, the day trial was scheduled to begin.

Defense counsel explained at the hearing that his motions to dismiss and for a continuance were based on the potential unavailability of witnesses Carolyn and Jabbar Lindsey ("the Lindseys"). According to counsel, the Lindseys were interviewed by police at the scene of the crimes and described the suspect as being in his early twenties, having short, blonde hair, and

22

wearing a sky blue shirt, characteristics which allegedly "differ[ed] materially from the physical appearance of Defendant." Counsel also alleged the Lindseys had since moved out of state to an unknown location. The court noted the Lindseys may have testimony material to the case and might be on a bus scheduled to arrive in St. Louis that afternoon. The court further stated it would continue the case to the following Monday, November 3, 2014 if the witnesses were not on the bus. When the Lindseys were not on the bus and did not appear in court later that afternoon, the court granted defense counsel's continuance request so counsel could attempt to locate and subpoena the witnesses, and the court reset the case for trial on November 3, 2014. Defense counsel made a record that Defendant personally opposed the continuance and asked the court to consider dismissing his charges. The court denied the motions to dismiss and found the trial would begin on November 3 whether or not the Lindseys were present.

Defendant's trial began on November 3, 2014. At a pretrial conference, defense counsel renewed the motions to dismiss or for a continuance, informing the court he was unable to locate the Lindseys. The prosecutor noted the Lindseys had not cooperated with the State, and Jabbar Lindsey had informed her he was living somewhere in Memphis, Tennessee and had no intention of coming back to Missouri unless the State paid his transportation. The prosecutor stated she sent paid bus tickets to the Lindseys at an email address provided by Jabbar Lindsey, but she had not received any communication from the Lindseys since. The prosecutor further noted the Lindseys had been uncooperative as far back as May of the previous year and their attitude had never changed. The court denied defense counsel's motions to dismiss or for a continuance, and counsel supplemented the record with documents and a recording containing the Lindseys' description of the suspect to the police near the time of the incident.

23

## 2.      Defendant's Arguments, Relevant Law, and Application

In this case, Defendant asserts the trial court erred in denying his motions to dismiss his charges on the basis of a violation of his right to a speedy trial under the Sixth Amendment of the U.S. Constitution and article I, section 18(a) of the Missouri Constitution.[8][9] *See State v. Sisco*, 458 S.W.3d 304, 313 (Mo. banc 2015). In determining this issue, we defer to the trial court's factual findings and credibility determinations and review de novo whether defendant's constitutional right to a speedy trial was violated. *Id*. at 311-13.

"The federal and Missouri constitutions provide equivalent protection for a defendant's right to a speedy trial." *Id*. at 313 (quotations omitted). There is no bright-line test to determine a violation of this right; instead, courts must balance four factors: (1) the length of the delay in bringing the defendant to trial; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) any prejudice suffered by the defendant as a result of the delay. *Id*. at 313 and *State v. Pate*, 469 S.W.3d 904, 908 (Mo. App. E.D. 2015) (citing *Barker v. Wingo*, 407 U.S. 514, 530-33 (1972)). Missouri Courts refer to these factors as the "*Barker* factors."

---

[8] Defendant also asserts the trial court erred in denying his motions to dismiss his charges on the basis of a violation of his right to a speedy trial under section 545.780 RSMo 2000, which is Missouri's speedy trial statute. *See State ex rel. McKee v. Riley*, 240 S.W.3d 720, 727 (Mo. banc 2007). Because section 545.780 RSMo 2000 authorizes a court to dismiss a defendant's charges only if there is a constitutional violation of his right to a speedy trial, the statute's application here is contingent on finding a constitutional violation. *State v. Sisco*, 458 S.W.3d 304, 312 n.9 (Mo. banc 2015); section 545.780.2 RSMo 2000. For the reasons discussed below, we find Defendant's constitutional right to a speedy trial was not violated. Accordingly, Defendant's claim that he was denied his right to a speedy trial under Missouri's speedy trial statute has no merit. *See id*.

[9] In his reply brief, Defendant argues for the first time on appeal that the trial court's ruling was also a violation of his rights under the Uniform Mandatory Disposition of Detainers Law ("the UMDDL"). We must reject this argument for two independent reasons. First, "a reply brief is to be used only to reply to arguments raised by respondents, not to raise new arguments on appeal," and an appellate court will not review an allegation of error made for the first time in the reply brief. *Ferguson v. State*, 325 S.W.3d 400, 414 (Mo. App. W.D. 2010) (quotations omitted). In addition, even if we were to review Defendant's claim under the UMDDL, Defendant's reply brief fails to cite to any authority indicating he has a basis for relief on appeal. Instead, Defendant only alleges in a conclusory fashion that "the trial court's ruling was also a violation of his rights under sections 217.450 to 217.485 RSMo, the [UMDDL] [,] [f]or the reasons formerly stated in Appellant's [opening] brief." Defendant's opening brief fails to set forth any argument concerning the UMDDL. Under these circumstances, Defendant is not entitled to relief on his claim under the UMDDL. *See Ferguson*, 325 S.W.3d at 414 (similarly holding).

24

*See, e.g.*, *State ex rel. Garcia v. Goldman*, 316 S.W.3d 907, 911-12 (Mo. banc 2010)*;*

*Giammanco v. State*, 416 S.W.3d 833, 839 (Mo. App. E.D. 2013).

### a. The Length of the Delay

The first factor, the length of the delay in bringing the defendant to trial, triggers the analysis of whether a defendant's constitutional right to a speedy trial has been violated, because unless there is a delay that is presumptively prejudicial, there is no need to consider the other three *Barker* factors. *Pate*, 469 S.W.3d at 908. A delay of eight months or more between the time of the defendant's arrest and his trial is presumptively prejudicial. *Id*. In this case, the delay of approximately seventeen-and-a-half months between Defendant's arrest on May 17, 2013 and the first day of Defendant's trial on November 3, 2014 is presumptively prejudicial. Therefore, we must consider and balance the other three *Barker* factors. *See id*.

### b. The Reasons for the Delay

Regarding the second *Barker* factor, the reasons for the delay in bringing the defendant to trial, we consider whether the delays are attributable to the State or the defendant and assign different weights to different reasons for the delay. *Sisco*, 458 S.W.3d at 313-14. A deliberate attempt by the State to delay the trial in order to hinder a defendant's defense weighs heavily against the State. *Id*. at 314. Neutral reasons, such as overcrowded dockets or the State's negligence also weigh against the State, but such delays are weighed less heavily. *Id*. However, "delays attributable to the defendant weigh heavily against the defendant." *Id*. (quotations omitted).

In this case, Defendant was arrested on May 17, 2013, and a grand jury indictment was filed less than two months later. On July 10, 2013, a public defender entered his appearance for Defendant and filed a request for discovery on his behalf. Court dates were rescheduled from

25

August 8, 2013 to November 1, 2013, but the record does not indicate who requested the rescheduling or why it was done. On November 22, 2013, Defendant's case was set for trial for March 31, 2014. After that time, defense counsel filed several motions, including multiple motions for a continuance and an unsuccessful motion for sanctions against the State. There was some delay which resulted from the State's performance of DNA analysis on a knife and because the Lindseys, potential witnesses at trial, were being uncooperative. In addition, the record reflects discovery was ongoing and voluminous. Defendant's trial began on November 3, 2014.

Nothing in the record indicates a deliberate attempt by the State to delay the trial in order to hinder Defendant's defense, and we find the reasons for the delay in bringing Defendant to trial are neutral or attributable to Defendant's counsel. We find any weight against the State due to neutral reasons, including delays resulting from the State's performance of DNA analysis and from the Lindseys being uncooperative, is slight. *Id.*

With respect to the delays in bringing Defendant to trial which are attributable to Defendant's counsel, Defendant notes he repeatedly filed motions for a speedy trial and objected to the continuances requested by his attorney. Similar circumstances took place in *State v. Taylor*, 298 S.W.3d 482 (Mo. banc 2009). In *Taylor*, defense counsel requested multiple continuances, over defendant's objections, so counsel could have more time to investigate, prepare for trial, and respond to newly-discovered evidence. *Id.* at 503, 504. On appeal, defendant argued his constitutional right to a speedy trial had been violated. *Id*. at 502. In discussing the second *Barker* factor, the Supreme Court noted "the reason for a substantial portion of the delay [in bringing defendant to trial] was to provide counsel with more time to prepare for trial, which effectively protected [defendant's] right to effective assistance of counsel." *Id*. at 504. While the Supreme Court did not explicitly weigh this reason for delay

26

against the State or the defendant, it ultimately found defendant's constitutional right to a speedy trial had not been violated. *Id*.

Like in *Taylor*, defense counsel in this case requested multiple continuances over Defendant's objections so counsel could have more time to investigate, prepare for trial, and respond to newly-discovered evidence. *See id*. at 503, 504. As in *Taylor*, the reason for a substantial portion of the delay in Defendant's trial was to provide counsel with more time to prepare for trial, which effectively protected Defendant's right to effective assistance of counsel. *See id*. at 504. "Any defendant that has exercised his right to counsel is guaranteed effective assistance of counsel, and courts should do the utmost to protect the defendant's right to adequate and competent representation." *State ex rel. Wolfrum v. Wiesman*, 225 S.W.3d 409, 412 (Mo. banc 2007). Based on the foregoing case law and principles, we decline to weigh the second *Barker* factor, the reason for the delay in bringing Defendant to trial, heavily against the State.[10]

### c. Defendant's Assertion of His Right to a Speedy Trial

"The third factor to be considered is whether and how the defendant asserted his right to a speedy trial." *Sisco*, 458 S.W.3d at 316. There is no rigid requirement with respect to when a defendant must assert his right to a speedy trial. *Id*. Instead, courts consider the timeliness of the defendant's assertion and the frequency and force of his objections. *Id*. As previously stated, Defendant was arrested on May 17, 2013. It is undisputed Defendant filed his first request for a speedy trial on October 25, 2013 and he continued to personally assert that request throughout the proceedings, including in his motions to dismiss prior to trial and in his motion for new trial.

---

[10] For purposes of our analysis, we find it is unnecessary to determine whether the delays resulting from defense counsel needing more time to prepare for trial weigh against Defendant. *See Taylor*, 298 S.W.3d at 504 (similarly remaining silent on the matter).

27

Because Defendant asserted his right to a speedy trial relatively early in the proceedings and did so repeatedly, this factor is weighed in his favor. *Pate*, 469 S.W.3d at 909.

### d. Any Prejudice Suffered by Defendant as a Result of the Delay

The final and most important factor in our analysis is any prejudice suffered by Defendant as a result of the delay in bringing him into trial. *Id*. Whether such a delay prejudiced the defendant is evaluated in light of three considerations: "(1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the defense will be impaired." *Sisco*, 458 S.W.3d at 317 (quotations omitted). Of these considerations, courts view the third as the most serious. *Id*. A defendant has the burden of "demonstrating that actual, not speculative or possible, prejudice occurred due to the delay in his trial," and general allegations of prejudice are insufficient. *State v. Greenlee*, 327 S.W.3d 602, 613 (Mo. App. E.D. 2010). Claims of prejudice must be supported by the record and a defendant's failure to present evidence or reasonable inferences of actual prejudice weighs heavily in favor of the State. *Id.* at 612-13.

> In this case, Defendant's sole allegations of prejudice are:
>
> [Defendant's] parole on another case was revoked as a result of this indictment, and his trial in this case was continued, over his objection, to a date beyond his [Missouri Department of Corrections ("MDOC")] release date. In other words, instead of being able to go to trial on this case while he was incarcerated in MDOC, [Defendant] had to wait until he completed his MDOC sentence before his trial in this case started. This resulted in oppressive pretrial incarceration lasting well over a year; [Defendant] was returned to MDOC on August 16, 2013, and his trial did not begin until November [3], 2014.
>
> [Defendant] also demonstrated prejudice by the loss of the testimony of Carolyn and Jabbar Lindsey, witnesses that even the trial court noted may have testimony material to the case. While the Lindseys were available and gave statements to the police near the time of the incident, they had moved out of state by the time of trial and became less willing to testify over time.

(citations omitted).

28

Although the restriction of freedom that comes with being incarcerated may give rise to actual prejudice, *see Sisco*, 458 S.W.3d at 317, Defendant's general claim of prejudice based upon the length of his incarceration establishes only minimal prejudice. *State v. Raine*, 829 S.W.2d 506, 513 (Mo. App. W.D. 1992). Notably, Defendant has not alleged any details of the conditions of his incarceration. *Cf. Greenlee*, 327 S.W.3d at 613 (finding defendant's allegations of prejudice resulting from his pre-trial incarceration were insufficient and too general even where he alleged he was cold, unable to sleep, and badly beaten by another inmate because he did not show the alleged prejudice occurred due to the delay in his trial). Further, although Defendant did spend an extended period of time incarcerated before his trial, he was sentenced to four terms of life imprisonment as a result of his convictions. Accordingly, Defendant has no claim that he has served additional jail time because of any delay in bringing him to trial. *See id.* (similarly finding). Therefore, Defendant has only shown minimal prejudice as it relates to his pre-trial incarceration.

With respect to the next consideration of prejudice, Defendant makes no allegations he suffered anxiety or concern due to the delay in his trial or that there were any specific instances which weighed heavily upon him. Therefore, Defendant has not shown he suffered actual prejudice as a result of pre-trial anxiety or concern. *See id*.

Finally, we turn to the most serious consideration of prejudice, whether Defendant has demonstrated his defense was impaired due to the delay in his trial. A defense may be impaired where defense witnesses become unavailable due to the delay in the trial. *Giammanco*, 416 S.W.3d at 840 (quotations omitted). Here, although Defendant's brief apparently claims that potential testimony from Lindseys was lost due to the delay in his trial, the record shows the Lindseys refusal to cooperate went back as far as May 2013, which is the same month the crimes

29

occurred. In fact, the documents and recording defense counsel supplemented to the trial court, which are a part of the record on appeal, indicate Defendant last cooperated with police on May 11, 2013, the day after the crimes occurred. Defendant has failed to provide the trial court or this Court with any evidence that the Lindseys would have further cooperated or testified had the trial been held earlier than November 2014. In other words, any claim that the Lindseys would have testified at Defendant's trial had it been held earlier is merely speculative and Defendant has not met his burden of proving actual prejudice as it relates to a possible impairment in his defense. *See Greenlee*, 327 S.W.3d at 613 (a defendant has the burden of "demonstrating that actual, not speculative or possible, prejudice occurred due to the delay in his trial"); *State v. Weeks*, 982 S.W.2d 825, 836 (Mo. App. S.D. 1998) (finding defendant did not meet his burden of establishing his defense was impaired due to unavailable witnesses where, *inter alia*, the record did not demonstrate defendant could have produced the witnesses at trial had the trial been held earlier).

Based on the forgoing, any actual prejudice suffered by Defendant was only due to the length of his pre-trial incarceration and was minimal.

### 3. Conclusion as to Point Three

In sum, the first and third *Barker* factors weigh in Defendant's favor because the length of the delay in this case is presumptively prejudicial and Defendant asserted his right to a speedy trial relatively early in the proceedings and did so repeatedly. However, the reasons for the delay in bringing Defendant to trial are neutral or attributable to Defendant's counsel, and this factor does not weigh heavily against the State. With respect to the most important *Barker* factor, prejudice, any actual prejudice suffered by Defendant was only due to the length of his pre-trial incarceration and was minimal. After balancing all of these factors, our Court holds the

30

presumption of prejudice in this case is outweighed and Defendant's constitutional right to a

speedy trial was not violated. *See Sisco*, 458 S.W.3d at 319 (similarly holding). Point three is

denied.

### III. CONCLUSION

The trial court's judgment is affirmed.

_____
ROBERT M. CLAYTON III, Presiding Judge

Lawrence E. Mooney, J., and
James M. Dowd, J., concur