STATE of Missouri, Respondent,

v.

Zacheriah TRIPP, Appellant.

No. WD 63005.

Missouri Court of Appeals,
Western District.

June 7, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 2, 2005.

Application for Transfer Denied
Aug. 30, 2005.

Ellen H. Flottman, State Public Defender Office, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Deborah Daniels and Shaun Mackelprang, Office of Attorney General, Jefferson City, for Respondent.

RONALD R. HOLLIGER, Judge.

Zacheriah Tripp appeals his convictions of first degree murder, kidnapping, and forcible rape. He raises three points of error on appeal. He first contends that the trial court erred by denying his pretrial motion to suppress DNA testimony or, alternatively, to continue the trial due to the State's failure to timely disclose data and bench notes concerning the State's DNA testing. Second, Tripp argues that the trial court plainly erred in permitting testimony regarding the contents of his laptop, claiming that the testimony was legally irrelevant, with its prejudicial effect outweighing any probative value it might have had. Lastly, Tripp contends that the trial court committed plain error by permitting a witness to testify concerning a conversation overheard between Tripp and his brother on the night of the victim's disappearance in which the brother stated that Tripp's mother had been looking for him for two and a half hours. We hold that Tripp presents no grounds of reversible error and affirm.

**Factual and Procedural Background**

On appeal, Tripp raises only issues of evidentiary error. He does not raise any argument that the evidence was not sufficient to sustain his convictions. Thus, it is unnecessary to set forth an extensive recitation of the facts and evidence underlying the offenses Tripp was convicted. However, for purposes of establishing context for Tripp's points on appeal, a brief summary of the underlying facts follows. Additional facts specific to each of his points on appeal will be set forth in the discussion of that individual point.

Sarah McCoy, a fifteen year old young woman, lived with her parents near Gower, Missouri. She attended East Buchanan High School, where she typically ended her school day and arrived home at about 3:40 P.M. or 3:45 P.M. Sarah's father, George McCoy, came home from work shortly after four o'clock on the afternoon of December 3, 2001. Upon his arrival, he found a portable compact disc player (later identified as Sarah's) in his yard. On further inspection, he saw that it was scratched and scuffed. He subsequently discovered that both the front door to the house and its screen door were standing open. Sarah's backpack was sitting by a coffee table near the door, but she was not in the house. This was unusual, as Sarah would always close and lock the front door of the house after coming home from school, awaiting her parent's return.

Sarah's mother arrived home a short time later, and both parents tried to locate their daughter. They contacted Sarah's boyfriend, who told them that he had seen her board the school bus to go home after school that day. He suggested that they contact Tripp, a fellow student at Sarah's school, who had been trying to persuade her to ride to school with him in his car during the previous week. Mr. McCoy went to Tripp's residence around 6:00 P.M. and spoke with Tripp, who said that he saw Sarah board a bus to go to a basketball game in West Platte, Missouri.

The McCoys contacted law enforcement and reported that Sarah was missing. A search was conducted over the following two days. Her body was discovered in a creek surrounded by cornfields on the afternoon of December 5, 2001. Her wrists were bound by two types of wire, one of which was used in portable headphones, the other was often used as a type of speaker wire. She was unclothed from the waist down and her bra had been torn open in the center front.

Further examination of her body revealed that she had bruises on her arms, lower legs, and face, and scratches on her lower back, buttocks, and legs. The scratches were long and linear, as if she had been dragged across the cornfield. Autopsy also revealed that she had been sexually assaulted prior to her death. There were also injuries and hemorrhaging in her eyes indicative of strangulation. The cause of Sarah's death was determined to be asphyxiation.

Investigators interviewed Tripp on December 4. Tripp denied being at or near the McCoy residence anytime the previous day. In his statement, he claimed to have spent much of the afternoon and evening driving around town. At various points, he indicated when he saw various people and his belief that they had seen him during his meanderings that afternoon. The police were largely unable to verify the claims Tripp made in his statement, as most of the people he claimed he encountered denied having seen him that day.

Tripp was arrested and charged with the offenses of first degree murder, kidnapping, as well as alternative counts of forcible rape and forcible sodomy. The case against Tripp was largely circumstantial, but did include DNA evidence obtained from hair samples taken from Tripp's vehicle which were consistent with Sarah's DNA. Tripp's first trial resulted in a mistrial due to a hung jury. He was retried and convicted by a second jury of the offenses of first degree murder, kidnapping, and forcible rape. This appeal follows.

## Discussion

### I. Standard of Review

Tripp concedes that his second and third points on appeal were not properly preserved in the proceedings below and that relief would only be available upon plain error review. As will be discussed in greater detail, below, we also conclude that the issues raised in his first point on appeal have not been properly preserved.

■ In order to grant plain error relief, two requirements must be satisfied. First, there must be a showing of plain error, which is error that is evident, obvious and clear. *State v. Hawthorne*, 74 S.W.3d 826, 829 (Mo.App.2002). Further, it is not merely sufficient for the defendant to have been prejudiced by that error. Rather, the face of the record must reveal that the error resulted in a manifest injustice or a miscarriage of justice. *State v. Mayes*, 63 S.W.3d 615, 624 (Mo. banc 2001). This is a benchmark higher than that required for a showing of mere prejudice. *See State v. Washington*, 92 S.W.3d 205, 211 (Mo.App. 2002).

### II. Refusal of Sanctions Related to Discovery of DNA Testing Procedures

Tripp's first point on appeal concerns an allegation that the trial court erred in refusing to suppress evidence from the State's DNA expert, or alternatively granting a continuance of the trial, due to the State's failure to timely disclose information relating to certain DNA testing performed with regard to the case. We find that Tripp has failed to show a manifest injustice or miscarriage of justice oc-

curred as the result of admitting the evidence or refusing to continue the case and deny this point on appeal.

## A. Background

The DNA testing concerned a seventeen-centimeter long hair that was found in Tripp's vehicle. The initial DNA testing of the hair was performed at the Missouri Highway Patrol crime lab, where a nuclear DNA test (using the PCR/STR method) was performed upon the root of the hair. That DNA testing yielded results that were consistent with DNA samples obtained from Sarah.

The hair shaft was subsequently sent to Reliagene Technologies, where Dr. Gina Pineda conducted a mitochondrial DNA test upon that sample. That test *excluded* Sarah as a donor of the mitochondrial DNA found in the hair shaft.

Pineda was advised of the discrepancy with the testing of the hair root, and the root was transmitted to Reliagene for further testing. After that testing, she concluded that the genetic material found in the hair root sample was a mixture from two different DNA donors. Sarah could not be excluded as one of the donors.

The multiple donors could be accounted for if the hair had somehow encountered DNA from Sarah prior to testing. The State took the position that this happened as a result of the crime. The defense contended that faulty testing procedures at the highway patrol crime lab caused cross-contamination of the hair root sample with Sarah's DNA from other samples.

Following the first trial (and the resulting mistrial), Pineda conducted additional testing of the hair and issued a new report regarding her findings. That report was disclosed to Tripp's counsel roughly two weeks prior to trial, which was set to begin May 1, 2003.

Tripp brought a motion seeking to suppress the new report or, in the alternative, that the trial be continued. At the pretrial hearing that followed, Dean Stetler, the defense DNA expert, indicated that he had not yet been provided sufficient information by the State to properly review and evaluate the report's findings. Specifically, he stated that he needed to review the testing protocols and raw data upon which Pineda's conclusions were founded. The trial court ordered the State to produce that information no later than April 28, 2003, and to make Pineda available for telephonic deposition the following day, if requested by defense counsel.

Defense counsel moved the trial court for reconsideration of its order, contending that there was insufficient time for Dr. Stetler to review the materials produced by the State or to conduct a meaningful deposition of Pineda. That motion was denied by the trial court.

On the morning of trial, defense counsel advised the court that the State had produced several hundred pages of DNA-related discovery late in the afternoon on April 29. Counsel indicated that his expert was reviewing that discovery and had ascertained that Pineda was not the only individual at Reliagene who had conducted the testing and that the other two technicians' bench notes were not supplied. Tripp's counsel again moved to suppress the DNA evidence or continue the trial. That motion was also denied, but the court ordered the production of the missing bench notes and directed the State to make Pineda and the other technicians available for deposition on Saturday, May 3, 2003.

Trial reconvened on May 5, at which point defense counsel indicated that there were still materials from Reliagene that had not been produced. A few more iterations occurred where Reliagene would pro-

duce additional information and Dr. Stetler would indicate that there were still missing materials left undisclosed. Ultimately, the trial court ordered the State to disclose all the data no later than 5:00 P.M. that day. That deadline passed, and the State indicated that there were no other materials to produce.

The following morning, however, the State provided defense counsel with still more information from Reliagene that had not been previously disclosed. At the time, the only response from defense counsel was "yeah. See, they exist. Acknowledge receipt of these. We'll go through them with the expert as soon as I can get them to him." Tripp did not reassert any objection at that point or seek a continuance. During a break in the trial later that morning, there was additional discussion concerning materials that still had not been disclosed. Both counsel agreed to permit the expert witnesses to confer directly, so that it could be determined what, if any, additional material needed to be produced by Reliagene. It is unclear from the briefs if any additional information was produced as a result of those discussions.

Pineda testified on May 8 and 9, 2003. Tripp did not renew his objection to the DNA evidence prior to her testimony, nor did he request a continuance or raise any suggestion that additional time was needed for review of the materials produced by the State prior to her testimony. Following her testimony, Tripp's counsel released her from a subpoena and she returned to Louisiana.

On May 12, Tripp's counsel renewed his motion to strike the DNA evidence. In the alternative, he asked the court to continue the trial for the purposes of recalling Pineda to offer additional testimony. In

support of his motion, Tripp indicated that the State disclosed an additional seventeen pages of information on May 7 and that Dr. Stetler had been unable to completely review those materials before Pineda testified the following day, finishing his analysis at 11:30 P.M. on May 9. The State indicated it had no objection to the defense calling Pineda but that the defense should pay the expense. The defense did not respond to this offer. Instead, Tripp's counsel claimed he had been prejudiced in his cross-examination of the State's witness. The trial court denied both motions.[1]

## B. The Alleged Error Was Not Properly Preserved

◼ The underlying issue in this point concerns the State's failure to timely comply with court-ordered discovery. Tripp requested two alternative forms of relief. He first requested prior to trial that the court suppress testimony from the State's DNA expert, Ms. Pineda, due to the tardiness with which the data that expert relied upon was provided to the defense. If the trial court elected not to suppress the testimony, he requested that the trial be continued, apparently to permit his DNA expert more time to study the data and to assist his counsel in preparing for trial and in cross-examining Pineda.

◼ Trial courts are vested with broad discretion in controlling discovery in criminal cases. *State ex rel. Jackson County Prosecuting Attorney v. Moorhouse,* 70 S.W.3d 552, 555 (Mo.App.2002). The decision of whether or not to suppress evidence as a sanction for noncompliance with discovery rests within the trial court's discretion. *State v. Johnston,* 957 S.W.2d

1. Any error in these rulings was not preserved in the motion for new trial and is not raised on appeal.

734, 750 (Mo. banc 1997). In situations where allegations of error have been properly preserved, this court may reverse if it concludes that the failure to impose sanctions resulted in fundamental unfairness or had "a real potential for substantively altering the outcome of the trial." *Id.*

Tripp contends that this error has been properly preserved. Tripp raised the discovery issue prior to trial and at various points prior to Pineda's testimony. Tripp did not reassert any objection, however, at the time the State turned over the final seventeen pages of data on May 6. Instead, Tripp's counsel merely acknowledged receipt of the produced materials and indicated that he was providing it to the defense DNA expert for review and analysis. Nor did Tripp reassert any objection at the time Pineda testified. Instead, he did not raise the issue again until after Pineda completed her testimony and had been released to return to Louisiana, when he filed a motion contending, again, that Pineda's testimony be suppressed or, alternatively, that the trial be continued to permit Pineda to be recalled to the stand.[2]

▮▮▮ At oral argument, Tripp's counsel argued that the issue so permeated the trial that it should be considered adequately preserved for appellate review despite a lack of contemporaneous objection. This position does not appear to be supported by the case law. To preserve an issue of evidentiary error, an objection must be made at a time contemporaneous to the challenged evidence. The failure to make an objection to challenged evidence at trial waives the issue on appellate review. *State v. Brown*, 953 S.W.2d 133, 139 (Mo. App.1997) This preservation requirement

can be waived, however, when defense counsel has done "everything he could reasonably have been expected to do contemporaneous with the witness['] testimony." *Id.*

That is not the case, here. Even accepting Tripp's argument that the issue was regularly discussed in the days leading up to Pineda's testimony, the disclosure of additional materials on May 6 presented a change in the circumstances before the court. It was, therefore, incumbent upon the defense to either reassert the issue at some point prior to Pineda's testimony in order that the court could reconsider the matter under the new circumstances before it. Tripp failed to do so, however.

We, therefore, hold that the claim of error is unpreserved and limit our review to plain error review pursuant to Rule 30.20. Accordingly, we will reverse only if Tripp makes a showing that both plain error occurred and that the error resulted in a miscarriage of justice or a manifest injustice. *Id.*

## C. No Showing of Manifest Injustice of Miscarriage of Justice Has Been Made

▮▮▮ Here, there was obviously an issue with regard to the State's timely production of DNA-related discovery. There were a number of times when the trial court would set a deadline and the State would claim that it had provided all the data underlying Pineda's report, only to then turn around and supply more information after the deadline had passed, usually after the defense would point out portions of that data or bench notes that were clearly missing.[3] Thus, there appears to be little question that the State failed to

**2.** Again we point out that those rulings are not issues on appeal. *See* note 1, *supra.*

**3.** Although the failure to produce those documents does not appear intentional on the

State's part, what its expert's thinking was in parceling out documents rather than turning over every relevant document at once is unknown.

comply with discovery. The issue, then, would appear to be whether the trial court's actions in response to those discovery violations were inappropriate. However, given that the issue is unpreserved, even assuming that the trial court committed plain error in either refusing to suppress Pineda's testimony regarding the DNA testing, a matter we need not decide here, reversal would be appropriate only if that error resulted in a manifest injustice or a miscarriage of justice. *See* Rule 30.20.

Here, Tripp argues that the State's tardiness in fully disclosing the DNA testing data, protocols, and bench notes prevented him from adequately cross-examining Pineda. Specifically, he contends that he was rendered unable to "confront" Pineda with Dr. Stetler's conclusions. He fails to make any showing or argument regarding what additional questions he would have posed to Pineda. Nor does he articulate which of Dr. Stetler's conclusions he was rendered unable to confront Pineda with because the discovery had not been received in a more prompt and thorough manner. Put another way, Tripp has failed to make any real showing of prejudice regarding this issue. Certainly, he does not establish that a miscarriage of justice or manifest injustice took place as a result of the tardy production of the documents requested.

Point denied.

## III. Admission of Evidence Regarding Contents of Tripp's Laptop

■ Tripp next argues that the trial court plainly erred in overruling his motion in limine seeking to exclude evidence regarding his laptop computer and its contents, in that the probative value of the evidence was outweighed by its prejudicial nature in that the State was permitted to argue that a "wipe utility" was used on the computer, raising an inference of consciousness of guilt, when in fact, there was no evidence showing that there was anything incriminating on the laptop.

### A. Background

The content of the hard drive on Tripp's laptop was analyzed by Mike Wilson, a computer forensic examiner with the St. Joseph Police Department. Wilson testified at trial regarding his findings. According to his review (using a forensic diagnostic program called "Encase"), 160 files on the laptop had been accessed, modified, or deleted between 7:00 P.M. and 8:00 P.M. on the day Sarah disappeared.[4] He also found that 328 files had been accessed in some manner about midnight.

Wilson also testified that, based upon a log entry on the hard drive, an installation of Microsoft Office had been deleted from the computer at 8:00 P.M. on December 3, 2001. Not only were there no Microsoft Office program files remaining on the drive, but Wilson was also unable to find any data files or word processing documents on the hard drive related to that program.

Wilson also observed that there was a significant amount of unallocated space on the hard drive. That unallocated space was filled with zeros. He located a reference to "wipeinfo.exe" in the computer's "swap file" on the hard drive. From those two factors, Wilson concluded that a utility known as "Wipe Info," part of the Norton Utilities suite, had been used to wipe data off of the hard drive. The computer, however, did not have Norton Utilities install-

---

4. However, on cross-examination, Wilson conceded that there was no indication that any files had actually been deleted, as that would have been noted separately by the Encase software. Thus, the record suggests that those 160 files had merely been accessed or modified, but not deleted.

ed on the computer, nor did Wilson find anything on the hard drive to indicate that those utilities had ever been installed on the system.

Charles Carr testified as a computer expert for the defense. He testified that nothing useful can be determined from the existence of zeros occupying the unallocated free space on the computer, given that some manufacturers supply hard drives in that manner. In other words, it was impossible to distinguish between a hard drive that data had been wiped from using a utility or one in which the unallocated space was in the same state as when it was delivered from the manufacturer. He further stated that he saw no indication that any program had been installed on the computer that could be used to wipe data from the hard drive. Tripp had sought to exclude testimony concerning the laptop through a motion in limine. He did not renew his objection, however, when Wilson was called to testify at trial.

The State did not broach the computer issue in its first portion of closing argument. The defense, however, did discuss the laptop's contents in its closing argument:

If one would accept that this boy did this murder, he had a computer thing going on it. Even their own expert said, if you turn the computer on, you access it, modify or deleted [sic] files. Could you tell us, sir whether there was [sic] any files deleted? No, but I saw a lot of empty space, a lot of zeros in empty space, and I concluded that that was the reason why, because there had been a program taken off the computer on December 3rd.

And what did Dr. Carr tell you, the man with the Ph.D. that's been doing this for 30 years and was familiar with Compaq and its manufacturing process? Zeros in unallocated space means noth-

ing. Would you say that means it is wiped? No. He says what that means is that space hasn't been used. The manufacturer checked that space before it was ever shipped out to the consumer. They do it with zeros and ones.

So, if you see zeros in the space, it could mean that it has been wiped or that it could mean that it just hasn't been used. And he told you about the tremendous amount of space that this particular computer had. And he told you how much it would have to have in order to use up all that space. And what was this boy doing with it? Playing games and music, primarily.

There was nothing on that computer. Even Mr. Wilson told you, I found nothing on that computer that associated that computer with this case. Nothing. Why is the computer in here? Because in our society now when a child is taken and molested, the first thing you see on TV is computers, because you can throw that on the wall and you'll see it.

The State briefly mentioned the computer testimony in the rebuttal portion of its closing argument, referring to Wilson's conclusion that a wipe utility had apparently been used on the computer:

The computer. The only thing that's curious about the computer is you've got all of this space that's left. And on the night of the murder, you uninstall an entire suite of programs, you uninstall them, and then law enforcement comes out and looks for that computer with a search warrant, can't find it, executed a search warrant in Stewartsville at the grandfather's house, can't find it, and it gets turned in later and all of that unallocated space and all of that slack space is zeroed out.

The only logical explanation Mike Wilson told you is that a Wipe Info—a wiping program was used on it. There

was evidence of Wipe Info. And then Dr. Carr from California comes in and says, Well, Norton Utilities includes the wiping. Well, did you find any evidence that Norton Utilities was on this computer, Well, no, no. I mean, he's right, law enforcement does look at computers for that kind of thing, you know.

## B. Analysis

 The trial court is vested with discretion in the admission of evidence. *See State v. Anderson,* 76 S.W.3d 275, 276 (Mo. banc 2002). If the issue is preserved, we may reverse only upon a showing that the trial court abused its discretion in admitting or excluding that evidence. *See State v. Williams,* 97 S.W.3d 462, 468 (Mo. banc 2003). Here, while there was a motion in limine by the defense to exclude evidence regarding the laptop, no objection was made to the evidence at trial. Thus, we may review only for plain error. *State v. Collins,* 962 S.W.2d 421, 423 (Mo.App. 1998).

 To be admissible, evidence must have both logical and legal relevance. *See Anderson,* 76 S.W.3d at 276. Logical relevance is established if the evidence "tends to make the existence of a material fact more or less probable." *Id.* Legal relevance is determined by balancing the probative value of the evidence against the likelihood that it might result in "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.*

It has been held that "[a]n act resembling an effort to conceal constitutes evidence reasonably implying consciousness of guilt." *State v. Shinn,* 921 S.W.2d 70, 73 (Mo.App.1996). Thus, the inquiry is whether the testimony, here, shows such an act. The evidence presented at trial established that Tripp once had the Microsoft Office suite installed on the computer, had used the computer for word processing, and had deleted the Office suite on the night of Sarah's disappearance. There was also evidence of a substantial amount of empty space on the computer and a reference to "wipeinfo.exe" in the computer's swap file (which is used to temporarily hold data from the computer's active memory).

Even accepting the testimony that a wipe utility had been used on portions of the computer's hard drive, the testimony stopped short of any indication that the primary use of such a utility would be to conceal information. Nor does it appear that such a conclusion could be inferred from the testimony in the record. The State's position would be stronger if there had been any testimony or other evidence that suggested that the laptop ever had anything on it that would connect Tripp with the offenses for which he was being tried or contained information that otherwise tended to have any bearing on the material facts of the case. Lacking such evidence, or more express testimony tending to show that the use of the computer on the night of Sarah's disappearance resembled an effort to conceal evidence, the logical relevance and probative value of the laptop testimony appears to be tenuous, at best.

Ultimately, we need not decide whether admission of the laptop testimony was erroneous, as Tripp's argument fails to establish a basis for plain error relief. Even if the admission of testimony regarding the contents of the laptop's hard drive constituted error, however, the error is unpreserved. Thus, Tripp must not only establish that the error constituted plain error, he must also show that admission of the evidence resulted in a manifest injustice or a miscarriage of justice. *See* Rule 30.20. A miscarriage of justice or manifest injustice arises from the improper admission of evidence when that evidence "had a deci-

sive effect on the jury's verdict." *State v. Malone*, 951 S.W.2d 725, 730 (Mo.App. 1997).

In this instance, that standard has not been met. The evidence was not significantly relied upon by the State in its argument. The first mention of the laptop during argument was made by Tripp's counsel. The State then briefly touched upon that testimony during its rebuttal. The State did not make an argument that Tripp wiped files from the system concerning the crime. Nor did the State express an argument that the jury should consider the activity on the hard drive of Tripp's computer the night of December 3 as raising an inference of consciousness of guilt. Instead, the only argument by the State was a passing reference to the free space on the computer and that there was evidence that a wiping utility had been used on portions of the hard drive. We are unconvinced that the testimony or the arguments of counsel on this issue had a decisive effect on the jury's verdict. Point denied.

## IV. Testimony of Mary Watkins

Lastly, Tripp claims that the trial court plainly erred in overruling his objection to the testimony of Mary Watkins regarding a conversation between Tripp and his brother in which the brother told him that his mother had been looking for him for two and a half hours the night of Sarah's disappearance. He contends that the testimony was inadmissible hearsay and that its admission resulted in a manifest injustice. We disagree, holding that the trial court did not err in admitting the testimony.

### A. Background

 Mary Watkins had gone to East Buchanan High School the evening of December 3 to wait for her husband, a coach at the school, to finish basketball practice. While waiting, she saw Tripp and his younger brother talking. She testified:

Q: Were you able to overhear the conversation?

A: Yes.

Q: What was the conversation?

A: They were arguing. The younger boy that came in said, "Where have you been?"

[Defense Counsel]: Objection. That would be hearsay, Judge.

The Court: Overruled.

Q: Go ahead.

A: The boy that came in said, "Where have you been? Mom has, mom has been looking for you for two and a half hours," and—

At this point, defense counsel again asserted an objection and a brief bench conference was held. Tripp's attorney argued that the testimony was inadmissible because it was hearsay "offered solely for the purpose of establishing the point asserted; that is, that there was a confrontation between these two boys and to solidify a time frame."

The trial court overruled Tripp's objection, but offered the following limiting instruction:

THE COURT: All right. The Court instructs the jury that the statement which the witness is attributing to the second boy that came in is not to be considered for truth of the content of what was asserted, but only to consider it as it relates to the response of the first boy that came in.

The testimony continued:

Q: Tell us again the conversation that you heard between these two boys.

A: Okay. When the boy came in the door, he said, "Where have you been? Mom's been looking for you for two and a half hours," and the boy that was coming out of the bathroom said, "Just shut up." So they continued this argument. It was the same conversation out the doorway.

While Tripp raised an objection at the time of Watkin's testimony, he did not assert any claim of error regarding her testimony in his motion for new trial. He acknowledges that the error, therefore, was not properly preserved and can only be reviewed for plain error.

## B. Discussion

 As with the previous point on appeal, the present point raises a question regarding admission of testimony, which we reverse only upon a showing that the trial court abused its discretion. *See Williams*, 97 S.W.3d at 468. The threshold question posed by Tripp's point on appeal is whether the out-of-court statement by Tripp's brother, as offered, was hearsay. To constitute hearsay, the out-of-court statement must be offered to prove the truth of the matter asserted and the value of the statement must depend upon its veracity. *Smulls v. State*, 71 S.W.3d 138, 148 (Mo. banc 2002).

Here, the State argued that the statement by Tripp's brother that their mother had been looking for Tripp for two and a half hours that evening was not being offered to establish that Tripp's location was, in fact, unknown to his mother for any particular time period. Instead, the State contends, the brother's statement was offered to establish context for Tripp's response Taken in that context, it would appear that Tripp's response is not so much a denial of the statement made by his brother but more of an expression of an unwillingness to discuss his whereabouts that evening. Offered for that purpose, the statement by Tripp's brother would not constitute hearsay. *See Bryan v. State*, 134 S.W.3d 795, 800 (Mo.App. 2004).

 Tripp's argument also fails because of a lack of any showing of prejudice. As stated in the discussion of Tripp's second point on appeal, to constitute a manifest in justice or miscarriage of justice, the error must have "a decisive effect on the jury's verdict." *Malone*, 951 S.W.2d at 730. In his brief, Tripp makes only a conclusory statement that admission of the testimony "caused a manifest injustice to Zach." Tripp does not develop that assertion, however. Absent a showing of manifest injustice or a miscarriage of justice, we cannot grant relief on plain error review. *See* Rule 30.20.

 Moreover, as the State indicates, the court gave a limiting instruction at the time the testimony was presented that directed the jury not to consider the hearsay statement for the truth of the matter asserted, but only as providing context for Tripp's answer. Generally, it is presumed that a jury will properly follow an instruction given by the court. *State v. Madison*, 997 S.W.2d 16, 21 (Mo. banc 1999). Here, there is no indication that the jury ignored, disobeyed, or was confused by the limiting instruction.

Even if the jury ignored or disobeyed that instruction and accepted as true that Tripp's mother had been looking for him for two and a half hours at the time the discussion between him and his brother took place, Tripp raises no argument how this would prejudice him. The State contends that the statement, if true, would not be inconsistent with Tripp's theory of the case. Tripp essentially presented a defense of alibi in other parts of the town and the surrounding areas at the time Sarah was kidnapped and killed. As such, the statement at issue, here, would not seem to lend any greater weight to the State's theory of the case than it would the defense theory. If anything, the statement would seem to lend equal support to both.

We are unconvinced that admission of the hearsay statement by Tripp's brother constituted error. Even if it was error

that rose to the level of plain error, however, there has been no showing of a manifest injustice or miscarriage of justice. Tripp's final point on appeal is denied.

### Conclusion

The three points Tripp raises on appeal have not been properly preserved for appellate review, limiting this court to plain error review. While Tripp directs the court's attention to issues of possible error, he fails to establish that any of them resulted in a miscarriage of justice or manifest injustice. Rule 30.20 requires such a showing, and in its absence, this court may not grant relief, even if the errors alleged constituted plain error. The judgment of the trial court, therefore, is affirmed.

EDWIN H. SMITH, Chief Judge, and VICTOR C. HOWARD, Judge, concur.