KURT S. ODENWALD, Judge
Introduction
Keith E. Wright ("Wright") appeals from the trial court's judgment, following a jury trial, convicting him on two counts of first-degree murder and two counts of armed criminal action. Wright raises four points on appeal. Wright initially charges the trial court with error for excluding evidence of an alternative perpetrator. In Point Two, Wright claims that the trial court erred in finding that the State did not violate his right to a speedy trial. In Points Three and Four, Wright argues that the trial court erroneously admitted his videotaped statements, made during a police interview, because they were cumulative and lacked proper foundation.
Because Wright presented no evidence that the purported alternative perpetrator committed an act directly connected to the charged crimes, we deny Point One. We reject Point Two because the pretrial delay did not prejudice Wright. Lastly, because the trial court did not err in admitting Wright's videotaped statements as rebuttal evidence, we deny Points Three and Four. We affirm.
Factual and Procedural History
I. Pre-trial Proceedings
Police officers arrested Wright on June 2, 2015, after finding Ricos Boyd ("Boyd") and Shayla Carter ("Carter") shot to death in the alley behind Wright's residence. On June 30, 2015, Wright was indicted on two counts of first-degree murder and two counts of armed criminal action.[1] The trial court placed the case on the trial docket and continued the case to October 2015. In September 2015, the trial court granted the State's request for a continuance because the State was waiting for the final police report. On October 25, 2015, Wright asserted his right to a speedy trial.
In November 2015, the trial court again granted the State a continuance because of the incomplete police report. In January *614 2016, the trial court approved the State's motion for a continuance due to the still unfinished police report and the assigned trial attorney's departure from the circuit attorney's office. Substitute counsel appeared for the State and, in February 2016, said counsel moved for additional time to prepare for trial and to receive the final police report. After a hearing and over Wright's objection, the trial court ordered another continuance. The trial court again reset the case in April 2016, after conducting another hearing, wherein the State explained that the prosecuting attorney was unavailable due to a scheduled break after several jury trials. The court finally scheduled Wright's trial for June 13, 2016.
Wright moved to dismiss the indictment alleging that the State violated his right to a speedy trial. Wright argued that he had consistent medical issues in jail, had experienced extreme anxiety due to his confinement, and was unable to see his children. The motion court denied Wright's motion, finding that, under all of the circumstances, the pretrial delay did not prejudice Wright. The trial court stated that there was no evidence that the State deliberately delayed the proceedings. Wright's jury trial began on June 13, 2016.
II. Trial
At trial, the State presented the following evidence. On June 2, 2015, Wright lived at 3623 North Newstead Avenue in St. Louis with his wife ("Michelle")[2] and their children. Zelma Higgins ("Higgins")-Michelle's aunt-lived nearby and frequently visited Michelle. Early that morning, Higgins walked past Wright's residence and heard Michelle arguing with a woman later identified as Carter. Higgins stopped and saw Michelle and Carter in Wright's backyard. Peering into the backyard, Higgins also spotted Boyd and Wright. Higgins recognized Boyd as Michelle's sexual partner. Carter was Boyd's close friend. Higgins also observed and identified Boyd's vehicle and Wright's vehicle parked in the alley. Higgins then wandered around the area, before pausing at a position where she could again view Wright's backyard. Michelle and Carter were still arguing.
As the argument persisted, Higgins witnessed Wright suddenly shoot Boyd multiple times, striking him in the thigh, back, neck, and buttocks. Boyd was unarmed. Higgins observed Wright move to the front of Boyd's vehicle to confront Carter. Carter was in the vehicle, holding up her hands, and pleading with Wright not to shoot. Wright shot Carter repeatedly, striking her in the side, back, and hand. Boyd and Carter died from their gunshot wounds. Wright and Michelle drove away from the scene. Higgins testified that, although she had taken crack cocaine that morning, the shooting sobered her. Higgins eventually flagged down some police officers.
Responding to the call, Detective Thomas Walsh ("Det. Walsh") arrived at the crime scene. Det. Walsh reported that the shooting occurred around 3:20 a.m. Twelve .40 caliber shell casings were recovered from Wright's backyard and alley. Testing revealed that the same firearm fired all twelve shell casings. Det. Walsh did not discover a firearm at the scene. Based on the information provided by Higgins, Det. Walsh identified Wright as a suspect. Later that day, detectives arrested Wright.
A. Wright's Testimony and Videotaped Statements *615 Wright testified in his own defense at trial. Wright explained that he was asleep at his home when he heard gunshots. Wright stated that he dressed, pulled his vehicle around to the front of his home, placed his children and Michelle in his vehicle, and left. Wright denied killing Boyd and Carter. Wright also claimed that he did not own a firearm, Wright acknowledged that he was aware, but not jealous, of Boyd's sexual relationship with Michelle, Wright later clarified that he was separated from Michelle, Michelle had relocated to Higginsville, Missouri, and he specifically knew of Michelle's new location.
During cross-examination, Wright admitted that his trial testimony contradicted statements he had made to detectives after the shootings. Specifically, after the shooting, Wright informed detectives that he did not have any knowledge or information about the shootings. But as the interview continued, Wright told the detectives that the shootings were in self-defense. Wright eventually confessed to detectives that he heard Michelle and Carter arguing, retrieved his .40 caliber firearm, shot the victims repeatedly, drove away from the scene, and discarded his firearm. Wright also purportedly provided specific details about the shootings in the interview.
Although Wright admitted making inconsistent statements, Wright maintained during cross-examination that the detectives' threats off camera to take away his children caused him make inculpatory statements. Further, Wright contended that the interviewing detectives provided him with the details of the crime, prompted his answers, suggested off camera that he claim self-defense, and coerced his incriminating statements.
In rebuttal, the State announced that it would call Det. Walsh-one of the interviewing detectives-and present a videotape of Wright's interview with the detectives.[3] Wright stated that he would object because the exhibit was cumulative and repetitive. The trial court never explicitly ruled on Wright's objection. The parties extensively discussed which components of the videotaped statements they would show to the jury, Wright withdrew other objections to portions of the videotape, and the parties agreed to certain redactions. Det. Walsh then testified that the exhibit was a fair and accurate representation of the interview and that no questioning of Wright occurred outside the recording. The State asked to admit the videotape. At that time, Wright did not object. The trial court admitted the exhibit, and the State presented it to the jury.
B. Alternative-Perpetrator Evidence
Wright also sought to introduce evidence that a witness saw an unknown person flee from the area of the shooting. The State opposed the admission of such evidence, arguing that without any direct evidence tying the alternative perpetrator to the shootings, the evidence was likely to confuse the jury and was inadmissible. Wright submitted the testimony of Stacey Torrey ("Torrey") as an offer of proof.
Torrey testified that, on the morning of the shootings, he was repairing a cable outage on the 4300 block of Lexington Avenue in St. Louis. Torrey was positioned around the corner-approximately a half block to one-and-a-half blocks-from the *616 site of the shootings. As Torrey was completing paperwork in his truck, he noticed a man in a hoodie, with a rough beard, wearing blue jeans, and running east on Lexington Avenue towards him. Concerned for his own safety, Torrey drove westward along Lexington Avenue. After circling back around to Natural Bridge Avenue, Torrey approached the crime scene. As he neared, Torrey spotted the arrival of several police vehicles and stopped to report. Torrey informed police officers that the man "you probably looking for just ran down past me." Wright was not the man Torrey observed.
The trial court excluded Torrey's testimony. The trial court found that although Torrey observed an unidentified man running a half block to one-and-a-half blocks from where the shooting occurred, Torrey's testimony did not establish that the man carried a firearm or ran directly from the site of the shootings. In denying the proffer of evidence, the trial court found that Wright did not offer any exhibits specifically demonstrating Torrey's position relative to the crime scene, and the timeline of Torrey's observances remained "very, very sketchy." The trial court noted that Torrey did not hear any gunshots or identify the time he arrived at the crime scene.
III. Post-trial Proceedings
After deliberating, the jury found Wright guilty on two counts of first-degree murder and two counts of armed criminal action. Wright moved for a new trial. In his motion, Wright challenged the trial court's ruling on his speedy-trial claim, arguing that the pretrial delay prejudiced him because Michelle relocated and her whereabouts were unknown at trial. Wright also argued that the trial court erred in admitting his videotaped statements and by excluding Torrey's proposed testimony.
The trial court denied Wright's post-trial motions. Finding Wright a prior offender, the trial court sentenced him to consecutive life sentences without the possibility of probation or parole on each of the murder convictions. The trial court also sentenced Wright to thirty years in prison on each of the armed-criminal-action convictions, running them concurrently with the life sentences. This appeal follows.
Points on Appeal
Wright raises four points on appeal. In Point One, Wright posits that the trial court erred by excluding evidence of an alternative perpetrator. Wright's Point Two charges the trial court with error for finding that the State did not violate his right to a speedy trial. In Points Three and Four, Wright contends that the trial court erred in admitting his videotaped statements because they were cumulative and lacked proper foundation.
Discussion
I. Point One-Alternative-Perpetrator Evidence
A. Standard of Review
The trial court is vested with broad discretion to exclude or admit evidence at trial. State v. Bowman, 337 S.W.3d 679, 686 (Mo. banc 2011). We review the trial court's evidentiary rulings for an abuse of that broad discretion. State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009). An abuse of discretion occurs when the trial court's decision to admit or exclude evidence is clearly against the logic of the circumstances then before the trial court and the ruling is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration. State v. Shegog, 521 S.W.3d 628, 633 (Mo. App. W.D. 2017). Further, we will reverse the trial court's *617 decision only if the defendant establishes both error and prejudice. Id.
B. No Abuse of Discretion
Wright argues that the trial court erred by excluding Torrey's proffered testimony regarding the unidentified man on Lexington Avenue. Wright maintains that the unidentified man's presence was more than mere evidence of the alternative perpetrator's opportunity or motive and did not warrant the trial court's application of the "direct connection" rule.
"Generally a defendant may introduce evidence tending to show that another person committed the offense, if a proper foundation is laid, unless the probative value of the evidence is substantially outweighed by its costs (such as undue delay, prejudice or confusion)." State v. Barriner, 111 S.W.3d 396, 400 (Mo. banc 2003). However, "[w]hen the evidence is merely that another person had opportunity or motive to commit the offense, or the evidence is otherwise disconnected or remote and there is no evidence that the other person committed an act directly connected to the offense, the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury." Bowman, 337 S.W.3d at 686. It is well established that evidence of an alternative perpetrator is not admissible if such evidence only casts a bare suspicion on another person or raises a conjectural inference that another person committed the charged offense. Shegog, 521 S.W.3d at 636.
Wright likens Torrey's testimony to evidence erroneously excluded in State v. Barriner, where the defendant was charged with murder after police discovered two victims, both bound by rope and having multiple stab wounds. 111 S.W.3d at 397-401. At trial, the defendant sought to introduce evidence of hairs found both on the victim's body and the rope used at the scene that did not match either the defendant or the victims. Id. at 399-400. The trial court denied admission of the hair evidence. Id. at 400. On appeal, the Supreme Court of Missouri found that the hairs represented more than evidence of an alternative perpetrator's motive or opportunity, and that the DNA evidence was not too disconnected or remote. Id. The Supreme Court reasoned that the hairs were "physical evidence that could indicate another person's interaction with the victims at the crime scene." Id. The Supreme Court determined that the defendant was entitled to present the evidence because it directly connected someone else to the charged crimes. Id.
As distinguished from the physical evidence at issue in Barriner, Torrey's proposed testimony does not directly tie the unidentified person to the charged crimes. Torrey did not see the man run from the backyard of Wright's residence, which was the site of the shootings. Instead, Torrey only saw the man running east on Lexington Avenue, around the corner and some distance away from where the shootings occurred. Torrey did not state that he watched the man arrive on Lexington Avenue from the direction of the crime scene. Torrey was unable to testify that the man carried a gun, or provide any other information that could link the man to the charged murders.
Nor could Torrey pinpoint the precise time he saw the man running on the street. Torrey did not testify that he heard any gunshots, describe the precise time of his observance, or identify when he interacted with the police officers. As a result, the trial court concluded that Torrey's testimony lacked the necessary temporal and spatial specificity to directly connect the unidentified man to the charged crimes. Simply, Torrey's evidence did not indicate another person's interaction with the victims at the crime scene. We agree.
*618 Rather than directly connecting a third-party to the charged crime, Torrey's testimony, at most, suggests that the unidentified man had a potential opportunity to commit the shootings. Alternate-perpetrator evidence that only demonstrates a third party's opportunity to commit the crime does not establish the required direct connection to the crime, and is inadmissible. Bowman, 337 S.W.3d at 688. Wright's opportunity evidence lacked a direct connection to the crimes at issue. See State v. Chaney, 967 S.W.2d 47, 55 (Mo. banc 1998) (stating that evidence of a known pedophile living in the area where the young victim went missing and the pedophile's lies to police about his whereabouts during the relevant time did not directly connect him to the charged murder); cf. State v. Proudie, 493 S.W.3d 6, 11 (Mo. App. E.D. 2016) (explaining that a third party was directly connected to the charged murder because of his admission that he was present when the victim was shot, he cleaned up her blood, and he helped dispose of her body).
To be admissible, Wright's proposed opportunity evidence had to establish the required direct connection between the alternative perpetrator and the charged crimes. See Bowman, 337 S.W.3d at 688. Torrey's offer of proof lacked a direct connection of the unidentified man to the shootings of Boyd and Carter. As a result, Wright fails to demonstrate that the trial court abused its discretion in excluding Torrey's testimony. Point One is denied.
II. Point Two-Right to a Speedy Trial
A. Standard of Review
We review de novo whether the defendant's right to a speedy trial was violated. State v. Sisco, 458 S.W.3d 304, 313 (Mo. banc 2015). However, we will defer to the trial court's factual findings and credibility determinations. Id.
B. No Speedy-Trial Violation
Both the United States and Missouri constitutions provide equivalent protections for a defendant's right to a speedy trial. Id.; see U.S. CONST. amend. VI ; MO. CONST. art. I, sec. 18(a). The right to a speedy trial requires the State to ensure that a defendant receives the early and proper disposition of any charged crimes. State v. Fisher, 509 S.W.3d 747, 751 (Mo. App. W.D. 2016). "Orderly expedition of a case, not mere speed, is the essential requirement behind a speedy trial." State v. Jones, 530 S.W.3d 525, 533 (Mo. App. E.D. 2017) (quoting State v. Greenlee, 327 S.W.3d 602, 611 (Mo. App. E.D. 2010) ). There is no bright-line test to determine a speedy-trial violation. State v. Smith, 491 S.W.3d 286, 305 (Mo. App. E.D. 2016). Rather, the court must carefully consider the facts and circumstances presented by each specific case. State v. Clark, 486 S.W.3d 479, 488 (Mo. App. W.D. 2016). To that end, courts must balance four specific factors when determining if a speedy-trial violation occurred: "(1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant resulting from the delay." Sisco, 458 S.W.3d at 313 (citing Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ). No individual factor is dispositive, and the court must "engage in a difficult and sensitive balancing process." Id. (quoting Barker, 407 U.S. at 533, 92 S.Ct. 2182 ).
1. Length of Delay
The first factor, the length of pretrial delay, "triggers the analysis of whether a defendant's constitutional right to a speedy trial has been violated, because unless there is a delay that is presumptively prejudicial, there is no need to consider the other three ... factors." Smith, 491 S.W.3d at 305. The State's delay in bringing a defendant to trial "is measured from *619 the time of a formal indictment or information or when actual restraints are imposed by an arrest." Sisco, 458 S.W.3d at 313. Missouri courts have found that "a delay of greater than eight months is presumptively prejudicial." Id. (internal quotations omitted). If the delay was presumptively prejudicial, the court must consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial [sic] examination." Id. (quoting Doggett v. U.S., 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) ).
Here, Wright was arrested and incarcerated on June 2, 2015. The first day of Wright's trial began on June 13, 2016. By exceeding the eight-month threshold, the resulting delay of over twelve months is presumptively prejudicial. See id. Accordingly, we consider whether the State's pretrial delay violated Wright's speedy-trial right in light of the other factors.
2. Reason for Delay
The second factor to consider is the reason for the pretrial delay. See id. As previously stated, the burden is on the State to provide the defendant a speedy trial, and the State must justify any substantial delays. Greenlee, 327 S.W.3d at 611-12. Different weights are given to the State's different justifications. State v. Ferdinand, 371 S.W.3d 844, 853 (Mo. App. E.D. 2012). "A deliberate attempt by the [S]tate to delay the trial is weighted heavily against the government, while '[a] more neutral reason ... should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.' " Id. (quoting State ex rel. Garcia v. Goldman, 316 S.W.3d 907, 911 (Mo. banc 2010) ). More neutral reasons for the delay include the State's negligence, overcrowded courts, or other reasons relating to the trial court's docket. State v. Mason, 428 S.W.3d 746, 750 (Mo. App. E.D. 2014). Valid reasons for the delay, such as missing witnesses, justify an appropriate delay and are not held against the State. Id. at 751. Delays attributable to a defendant, in contrast, are weighted heavily against him or her. Id.
The State requested and received continuances in September 2015 and November 2015 due to incomplete discovery; specifically, the State had not obtained a final police report. In January 2016, the State requested and received a continuance because of incomplete discovery and due to prosecuting counsel's departure from the circuit attorney's office. The trial court also granted the State's request to continue the case to ensure substitute counsel was adequately prepared for trial and received the final police report in February 2016. In April 2016, the trial court, after a hearing, granted the State's motion to reset the trial because prosecuting counsel had several jury trials scheduled for that month.
Without question, the record shows that the State was responsible for the pretrial delay. However, the trial court tempered this finding with an explanation that the State's proffered reasons were not a deliberate attempt to postpone the trial to gain an impermissible advantage. The record supports this conclusion. The reasons offered by the State-waiting on police reports, substituting counsel, preparing substitute counsel, and managing prosecuting counsel's trial docket-should weigh against the State, but do not indicate, in this case, a deliberate delay intended to violate Wright's rights and prejudice his defense. As a result, the second factor weighs slightly against the State. See Ferdinand, 371 S.W.3d at 853.
3. Assertion of Right to Trial
The third factor we must consider is the manner in which the defendant asserted *620 his or her right to a speedy trial. Sisco, 458 S.W.3d at 316. Although there is no strict requirement dictating the manner in which the defendant raises the issue, the court will weigh the timeliness, frequency, and force of the defendant's assertions of his or her right to a speedy trial. See id.
Here, Wright invoked his right to a speedy trial on October 25, 2015, and thereafter consistently objected to the State's motions for continuances. Wright moved to dismiss for speedy-trial violations and included the issue in his motion for a new trial. Because Wright raised his right relatively early in the proceedings and maintained his objections throughout the case, this factor also weighs against the State. See Smith, 491 S.W.3d at 307.
4. Prejudice to Defendant
The fourth and final factor is our analysis of the prejudice, if any, Wright suffered due to the pretrial delay. See id. This fourth consideration is the most important factor the court must examine. Ferdinand, 371 S.W.3d at 854. We evaluate the prejudice suffered by the defendant in light of three concerns: "(1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the defense will be impaired." Sisco, 458 S.W.3d at 317 (quoting Garcia, 316 S.W.3d at 912 ). The third concern, the possible impairment of the defense, is the most serious and vital concern. Mason, 428 S.W.3d at 752 ; Greenlee, 327 S.W.3d at 612. In order to demonstrate prejudice, the defendant's "[c]laims of prejudice must be actual or apparent on the record, or by reasonable inference, while speculative or possible prejudice is not sufficient." Greenlee, 327 S.W.3d at 612-13. The defendant has the burden to present evidence of actual prejudice, and the failure to do so weighs heavily in favor of the State. Mason, 428 S.W.3d at 752.
On appeal, Wright claims his confinement prejudiced him because his medical conditions went untreated, he lost access to his children, and Michelle was unavailable to testify. The record indicated that Wright represented to the trial court that he suffered from asthma and a mouth injury and that he was unable to see his children. However, Wright does not detail, nor does the record reveal, any specific instances of the oppressive nature of his pretrial incarceration. Indeed, Wright does not allege and prove facts establishing that his pretrial confinement was overly excessive given the serious charges and evidence levied against him. See Smith, 491 S.W.3d at 308 ; Greenlee, 327 S.W.3d at 613.
Most critical to our analysis, Wright fails to demonstrate that any pretrial delay affected his ability to defend against the charges at trial. While Wright suggests in his post-trial motion that the delay prevented him from calling Michelle to testify because she relocated before the trial, Wright did not establish that Michelle would testify if located, what her testimony would be, or how it would help or aid his defense. Instead, Wright merely speculated that Michelle's testimony would be beneficial to him. Mere speculation as to the contents and nature of Michelle's testimony is insufficient to establish that her absence prejudiced Wright's defense. See Ferdinand, 371 S.W.3d at 855.
Further, the record refutes Wright's claim that he could not locate Michelle due to the pretrial delay. Wright testified at trial that he knew Michelle had relocated. Moreover, Wright stated that Michelle moved to Higginsville, Missouri. When Wright was specifically asked if he knew "exactly" where Michelle was, he responded "Yes." Later, Wright indicated that he "kind of" understood Michelle's current location. Either response belies Wright's *621 contention on appeal that he "had only the vaguest idea of her location[.]" The record before us strongly suggests that the pretrial delay did not hinder Wright's defense or cause him actual prejudice. As a result, this factor weighs heavily in favor of the State.
After considering all the factors, we find that the time between Wright's arrest and the start of his trial did not violate his right to a speedy trial. We acknowledge that Wright was incarcerated for an extended period before his trial, that Wright asserted his right to a speedy trial, and that the State caused the delay. However, the most important factor-Wright's lack of prejudice-weighs heavily here against him. A careful balancing of all four factors shows no violation of Wright's right to a speedy trial. Accordingly, we hold that the trial court did not err in denying Wright's motion to dismiss for a speedy-trial violation. Point Two is denied.
III. Points Three and Four-Wright's Videotaped Statements
A. Preservation for Appeal
In Points Three and Four, Wright challenges the trial court's admission of his videotaped statements. The State counters that because Wright failed to properly object to the videotaped statements, we may review these points only for plain error. Wright concedes that he did not object at trial on the basis that the videotaped statements lacked a proper foundation (Point Four). However, Wright argues that he properly objected that the videotaped statements were cumulative (Point Three). We disagree.
"To preserve an issue of evidentiary error, an objection must be made at a time contemporaneous to the challenged evidence." State v. Tripp, 168 S.W.3d 667, 674 (Mo. App. W.D. 2005) ; see, e.g., State v. Pascale, 386 S.W.3d 777, 779-80 (Mo. App. E.D. 2011). Specifically, regarding evidentiary matters, a party must assert an objection when that testimony or exhibit is admitted at trial. See State v. Duke, 427 S.W.3d 336, 342 (Mo. App. S.D. 2014). "Objections must be specific, must set forth a basis for the objection, and must be sufficiently definite so as to alert the trial court that an objection is being made." State v. Neighbors, 502 S.W.3d 745, 748 (Mo. App. W.D. 2016). Indeed, "[i]t is incumbent on the objecting party to make the basis of his [or her] objection reasonably apparent to the trial court in order to provide the opponent an opportunity to correct the error and for the court to correctly rule on it." State v. Sykes, 480 S.W.3d 461, 465 (Mo. App. S.D. 2016). A party's failure to timely object to the challenged evidence renders it unpreserved for appellate review. Tripp, 168 S.W.3d at 674.
After the defense rested, the State introduced its rebuttal witness and evidence. Pertinent here, the State announced its intention to offer Wright's videotaped statements. Wright indicated that he would object to the videotaped statements because they were cumulative and repetitive to his admissions on cross-examination. The trial court never expressly ruled on this objection. The parties instead debated which portions of the videotaped statements would be shown to the jury. During the lengthy discussion, Wright withdrew some of his other objections to the statements, and the parties agreed to redact some segments of the videotape, Det. Walsh then testified, identifying the exhibit and explaining that it was a fair and accurate representation of the interview with Wright. The State moved to admit the exhibit. Wright made no objections. The trial court admitted the exhibit.
Here, the record shows that Wright did not object when the State moved to admit the exhibit. Nor did Wright renew, or refer to, his previous *622 cumulative-and-repetitive objection when the State asked the trial court to admit the exhibit. Wright's failure to object when the State ultimately moved to admit the evidence renders the issue unpreserved for appellate review. See Duke, 427 S.W.3d at 342 (explaining that the defendant failed to preserve an issue for appeal when he objected only the first time the prosecutor asked the detective about objectionable evidence and did not object later when the detective ultimately gave his testimony on the matter).
Further, Wright's initial objection did not preserve the issue for appeal. After Wright stated that the videotape was cumulative and repetitive, there was a lengthy discussion between the parties and the trial court on which portions of the videotape the jury should view. During the discussion, Wright withdrew other objections and agreed to certain redactions. Wright never asked for a continuing objection on his cumulative-and-repetitive theory, reasserted his prior objections when the trial court ultimately admitted the exhibit, or obtained a specific ruling on the issue. Under the circumstances, Wright did not properly preserve his objection to the videotape on the basis that it was cumulative or lacked proper foundation. As a result, we may only review Points Three and Four for plain error under Rule 30.20.[4] See id.
B. Plain-Error Standard
An unpreserved issue is limited to plain-error review. State v. Kunonga, 490 S.W.3d 746, 760 (Mo. App. W.D. 2016) ; Rule 30.20. Plain-error review involves a two-step process. Kunonga, 490 S.W.3d at 760. "First, we determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice has resulted." State v. Reynolds, 502 S.W.3d 18, 24 (Mo. App. E.D. 2016). "Unless the error is obvious, evident, and clear from the face of the claim, the appellate court should exercise its discretion and decline to review the claim." State v. Williams, 502 S.W.3d 90, 94 (Mo. App. E.D. 2016). If plain error is facially established, then we may proceed to the second step and analyze whether the error actually resulted in manifest injustice or a miscarriage of justice. Reynolds, 502 S.W.3d at 24-25. The plain-error rule should be used sparingly and not employed to review every unpreserved point. Id. at 25.
C. No Plain Error
In Point Three, Wright contends that the videotaped statements were cumulative because he admitted on cross-examination that he made prior statements contradicting his trial testimony. In Point Four, Wright asserts that the videotaped statements lacked a proper foundation because the State did not first impeach him with his prior statements. According to Wright, the State did not confront Wright with each specific prior inconsistent statement, allow him to refresh his recollection, and provide him with the opportunity to admit or deny making each statement.
We allow the trial court broad discretion in determining the admissibility and scope of rebuttal evidence. State v. Smith, 265 S.W.3d 874, 878 (Mo. App. E.D. 2008). Competent evidence that tends to explain, counteract, repel, or disprove evidence offered by defendant may be offered in rebuttal of the defendant's testimony or evidence. See State v. Floyd, 347 S.W.3d 115, 122 (Mo. App. E.D. 2011) ; State v. Petty, 967 S.W.2d 127, 141 (Mo. App. E.D. 1998). Indeed, if the defendant first raises an issue directly or impliedly on direct examination or cross-examination, it becomes a proper subject for rebuttal.
*623 State v. Gillespie, 401 S.W.3d 560, 563 (Mo. App. E.D. 2013).
Contrary to Wright's contentions on appeal, his videotaped statements to detectives were not cumulative or lacking proper foundation. During his testimony, Wright maintained that the detectives influenced his prior statements-in which he confessed to shooting Boyd and Carter-by threatening to take away his children and instructing him to claim self-defense off-camera. Further, Wright attempted to explain his intimate knowledge of the shooting by claiming that the detectives, in their questioning, furnished him with the information necessary to permit his later confession. Wright indicated that his prior statements were the direct result of the detectives' improper and suggestive interviewing techniques.
After Det. Walsh testified that the exhibit was a fair and accurate representation of Wright's interview and encapsulated the entire questioning, the State then presented the videotaped statements. In so doing, the State rebutted Wright's claim that the detectives provided him with the specifics of the crime and that they prompted his answers. By showing the nature and manner of his responses, the State also rebutted Wright's contention that the detectives compelled his confession by threatening his children and by instructing him to claim self-defense. The videotaped interview was evidence that contradicted and impeached Wright's claims that his prior inconsistent statements were the product of the tactics employed by the detectives in the interview. See State v. Irby, 254 S.W.3d 181, 190-91 (Mo. App. E.D. 2008) (stating that a witness's videotaped statement, inconsistent with his trial testimony, was admissible to contradict his claim that police coerced the prior statement). Accordingly, the videotaped interview was not cumulative to Wright's testimony on cross-examination, nor required any additional foundation. See State v. Neely, 979 S.W.2d 552, 560 (Mo. App. S.D. 1998) (finding that, even though the witness admitted that he made prior inconsistent statements, the trial court did not err in playing his prior recorded statements because "the jury should have [the evidence] in the best form for judging its credibility."); State v. Dale, 874 S.W.2d 446, 452 (Mo. App. W.D. 1994) (explaining that additional foundation is not necessary for the State to offer rebuttal evidence contradictory of statements made by the defendant in his or her testimony). The trial court did not commit error in admitting the exhibit. Points Three and Four are denied.
Conclusion
The judgment of the trial court is affirmed.
Robert G. Dowd, Jr., P.J., concurs.
Sherri B. Sullivan, J., concurs.

The State subsequently amended the charges to allege that Wright was a prior offender.

Because Wright's wife shares a surname with other persons mentioned in this opinion, we use her first name to avoid confusion.

Although Wright complains that the trial court erred in admitting his videotaped statements, he does not provide this Court with the exhibit at issue. When the appellant omits transcripts and exhibits from the record on appeal, we infer that the omitted evidence would not help his or her claims. See State v. Thompson, 147 S.W.3d 150, 161 n.7 (Mo. App. S.D. 2004).

All rule references are to Mo. R. Crim. P. (2017).